# United States Court of Appeals
## For the First Circuit

No. 21-1336

RITCH CARDY DORCE,

Petitioner,

v.

MERRICK B. GARLAND, Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Barron, Chief Judge,
Lynch and Lipez, Circuit Judges.

Kristin Macleod-Ball, with whom Jennifer Klein, the Committee for Public Counsel Services, Trina Realmuto, and the National Immigration Litigation Alliance were on brief, for petitioner.
Aric A. Anderson, Trial Attorney, Office of Immigration Litigation, with whom Brian Boynton, Acting Assistant Attorney General, and Leslie McKay, Senior Litigation Counsel, were on brief, for respondent.

October 3, 2022

LYNCH, **Circuit Judge**.  Ritch Cardy Dorce petitions for review of the Board of Immigration Appeals ("BIA") decision of April 7, 2021, affirming the denial of his application for cancellation of removal.  The BIA both rejected Dorce's argument that he had not received proper notice as required under the Due Process Clause of the Fifth Amendment, the Immigration and Nationality Act ("INA"), and regulations governing his hearing before the Immigration Judge ("IJ"), and held that Dorce had not shown, as he was required to, that not receiving proper notice prejudiced the outcome of his case.  Because substantial evidence supports the BIA's determination that Dorce had not shown prejudice and the BIA committed no errors of law in that ruling, we deny Dorce's petition for review.

## I.

Dorce was born in Haiti in 1996 and moved to the United States as a lawful permanent resident in 2000.  He lived in Florida with his grandmother for many years before moving to Massachusetts to live with his father around 2011.  After periods of homelessness, Dorce eventually moved in with Stacey Fragile, his (now former) girlfriend with whom he now has two U.S.-citizen children.

Shortly after turning 18, Dorce committed serious criminal acts.  On July 27, 2018, Dorce was convicted following a jury trial in the Brockton, Massachusetts District Court of

carrying a firearm without a license, in violation of Mass. Gen. Laws ch. 269, § 10(a).[1]  Dorce, then aged 20, had posted a video on social media of himself brandishing a firearm and claiming to have shot at an occupied residence on New Year's Eve 2016 after he was involved in a fight at that residence.  Someone had, in fact, shot at the residence a couple hours before Dorce posted the video on social media.  Dorce was sentenced to two years in prison.

In April 2019, Dorce was served a Notice to Appear ("NTA") that charged him as removable under 8 U.S.C. § 1227(a)(2)(C) based on his firearm conviction.  He was transferred to the custody of the Department of Homeland Security and detained at the Plymouth House of Corrections in Massachusetts for the duration of his removal proceedings.

In August 2019, Dorce admitted the factual allegations in the NTA, and the IJ sustained the charge of removability against

---

[1]  Dorce initially was charged with seven counts: (1) carrying a firearm without a license, Mass. Gen. Laws ch. 269, § 10(a); (2) possessing ammunition without a FID card, id. § 10(h)(1); (3) carrying a loaded firearm without a license, id. § 10(n); (4) assault with a dangerous weapon, Mass. Gen. Laws ch. 265, § 15B(b); (5) malicious destruction of property, Mass. Gen. Laws ch. 266, § 127; (6) malicious damage to a motor vehicle, id. § 28(a); and (7) discharging a firearm within 500 feet of a building, Mass. Gen. Laws ch. 269, § 12E.  He was acquitted of counts two, four, five, and six, and counts three and seven were dismissed.

him.[2]  The IJ also found Dorce may be prima facie eligible for various forms of relief from removal, including asylum and cancellation of removal for lawful permanent residents.  Dorce, who was pro se before the IJ, filed applications for asylum, 8 U.S.C. § 1158, withholding of removal, id. § 1231(b)(3), protection under the Convention Against Torture, 8 C.F.R. §§ 1208.16(c)(2), 1208.18(a)(1), and cancellation of removal, 8 U.S.C. § 1229b(a), at a September 30, 2019 hearing.[3]

The IJ told Dorce at the September 30 hearing that his merits hearing would be held on December 4, 2019.  The IJ also informed Dorce that he "can have anybody come in and speak on [his] behalf for either one of [his] applications."  The IJ explained:

> [T]he cancellation application is, like, a scale. . . .  On one side's going to be all the positive factors in your case, such as your length of time, how old you were when you first came to the United States, what family members you have here, things you may have done for your community, against the negative side, which would be the seriousness of your criminal history, how recent it is, whether you've shown rehabilitation. . . . [B]asically, whichever way that scale tips, is the way the Court rules . . . .

---

[2]     Dorce had at least two earlier appearances by videoconference before the IJ, where the IJ continued Dorce's proceedings to give him time to obtain counsel.

[3]     Dorce's petition concerns only the cancellation of removal application.

- 4 -

The same day, the immigration court mailed written notice of the December 4 hearing to Dorce at his Plymouth address. Dorce admits he received that notice.

The record shows that on November 27, 2019, the immigration court mailed another notice to Dorce at the same address, stating that his merits hearing was now scheduled for December 19, 2019.

## A. Merits Hearing

Dorce was present at his December 19 hearing. He never stated to the IJ that he had not received prior notice of that hearing, nor did he lodge an objection on that basis. Dorce also did not ask for additional time to gather witnesses to testify on his behalf. He told the IJ that "[his] father was supposed to come, and [his] uncle," and that he did not know where they were. The IJ asked Dorce why Fragile, the mother of his children, was not present and Dorce responded: "She was supposed to be. I don't know what happened. She told me she would come."

Dorce relied on his own testimony (and a few exhibits), which was developed through questioning by the IJ and government counsel. Dorce testified primarily about his U.S.-citizen children, his history with unemployment and homelessness, his community service, the circumstances of his firearm conviction, and the classes he took in prison.

After hearing Dorce's testimony, the IJ rendered an oral decision denying Dorce's application for cancellation of removal as a matter of discretion and his other applications on the merits. The IJ found Dorce generally credible with one critical exception: the IJ had "issue and concern regarding [Dorce's] truthfulness and candor regarding his criminal conduct and the circumstances surrounding his criminal offense." The IJ denied his cancellation of removal application because she found that Dorce's negative factors outweighed the positive.

The IJ acknowledged that Dorce had "positive factors" in his case, including his community service, his residence in the United States for many years, and his two U.S.-citizen children. She found these factors "undercut by the fact that [Dorce is] not on the birth certificate for the children, the children are receiving Government benefits, [and Dorce has] not provid[ed] for the . . . children." Further, the IJ found Dorce's "conviction for possession of a firearm without a proper license to be a very serious offense, and weigh[ed] this as a very significant adverse factor." This was based on the IJ's finding that Dorce,

> at minimum, took a video in which he brandished a firearm, portrayed that he had gone back to a party after having an altercation at the party, and shot the residence with the firearm. . . . [Dorce] had a nine-millimeter handgun in the video. He took the magazine out of the handgun, tipped the camera down to video that the magazine was empty, and indicated that it did

not matter that he had run out of bullets while shooting, that he was going to get some more and go back.

The IJ also pointed to evidence in the record that Dorce had been associated with a gang, specifically the Zoe Pound Gang. Dorce made a Facebook post stating "Zoe Gang or no gang," which was "interestingly deleted shortly after the criminal investigation occurred after the shooting on New Year's Eve." The IJ ordered Dorce removed to Haiti. He was deported in 2021.

## B. Appeal to the Board of Immigration Appeals

Dorce filed a pro se appeal to the BIA in December 2019. He again did not make any assertion of the alleged lack of notice of his rescheduled notice hearing or present any arguments on that basis. Dorce did not raise his lack-of-notice claims until his counseled brief to the BIA, which was submitted with declarations from himself, his father, his uncle, his sister, and Fragile.

Dorce stated in his declaration that "[f]our witnesses planned to testify for [him] at [his] deportation hearing on December 4, 2019" and that he "was really confused when [his] hearing never happened that day." He said his father and uncle went to the court on December 4 and were told that Dorce "wasn't there and that the hearing wasn't going to happen."

Dorce asserted in his declaration that about a week after December 4, he had an undocumented, ex-parte videocall with his IJ, during which the IJ allegedly told Dorce that his December 4

- 7 -

hearing was postponed due to a scheduling error and that she "didn't know yet when [his] hearing would be, but that the [Immigration and Customs Enforcement] officers would bring [Dorce] a paper to let [him] know." Dorce stated in the declaration that he did not receive written notice after that videocall, so he called the immigration court on or around December 16 for his new hearing date, which was December 19. Dorce stated that he then called his sister to have her arrange for his witnesses to come to the immigration court to testify on December 19, but none of his witnesses did so.

The declarations of his family and Fragile set forth the testimony the declarants allegedly would have given had they attended Dorce's merits hearing.[4]

---

[4] The witness testimonies that Dorce would have presented, according to the declarations he submitted, are as follows:

Dorce's father would have testified that Dorce "is a good guy. A quiet guy. He's not a trouble guy." Dorce's father provided no examples or explanation for why he believed that was so.

Dorce's uncle would have testified that he lived with Dorce in Florida when Dorce was young and that Dorce "was always a good kid. . . . He didn't get into a lot of trouble at school." Dorce's uncle also would have testified that Dorce "has been in trouble with the law once in his life . . . because he was trying to show that he was tough to other some other [sic] kids." Dorce's uncle would have said Dorce "deserves a second chance." The declaration does not give specific details to explain why he believes that was so.

Fragile would have testified that Dorce "has really created a bond with [her] family," and that his children miss him. She would have told the judge "why [she] know[s] that [Dorce] isn't dangerous." The declaration does not elaborate as to why Fragile believed that was so.

The BIA "reviewed the declarations submitted" and rejected Dorce's lack-of-notice claims.[5]  It determined that Dorce failed to rebut the presumption of notice:

> The record reflects that the notice for the December 19th hearing was mailed to the respondent.  There is no indication in the record of proceeding that it was undeliverable or that the respondent notified the Immigration Judge at the hearing that he had not received the notice and that he was unprepared to proceed with his case.  Moreover, the hearing notice was dated November 27, 2019, more than a week before the alleged video call with the Immigration Judge.  Thus, if such video call had taken place, it is not credible that the Immigration Judge was not aware that the hearing had been rescheduled.  The respondent has therefore not established any procedural error by the Immigration Judge.

The BIA also rejected Dorce's claim that he was prejudiced by the alleged lack of notice, stating it was "not persuaded of any prejudice likely affecting the outcome of these proceedings."  The BIA stated it had "reviewed the declarations submitted by [Dorce's] father and uncle on appeal and [did] not find that they offer[ed] any additional or meaningful information

---

Dorce's sister never intended to testify, though she submitted a declaration describing her efforts to coordinate witnesses to testify at Dorce's hearing and the effect of the change of date.  Dorce did not proffer any declaration by his sister at his merits hearing.

[5]   Although Dorce failed to raise the lack-of-notice issue with the IJ, the BIA reached the merits of that claim.  There is no jurisdictional bar to our reviewing the BIA's denial of it.  See Peulic v. Garland, 22 F.4th 340, 352 n.9 (1st Cir. 2022).

- 9 -

that was not already considered by the Immigration Judge or that would offset the negative factors in [Dorce's] case to merit relief." Rather, the BIA found those declarations "merely offer[ed] generalized statements that [Dorce] is a 'good guy' and request[ed] that he be given a second chance . . . ." And as to Fragile's declaration, the BIA found that it did not "offer any specific details that [would] contravene[] the Immigration Judge's finding" or would add to the discussion of Dorce's criminal conviction.

The BIA held that, in light of "the deficiencies with the declarations," the proposed witness testimonies would not likely have changed the outcome of Dorce's proceedings. The agency added that the IJ's discretionary denial of Dorce's application for cancellation of removal was correct because Dorce's "undesirability as a permanent resident outweigh[ed] the favorable factors and the social and humane considerations presented on his behalf."

Dorce has petitioned this court for review of the BIA's affirmance of the denial of cancellation of removal.

## II.

Here, our "focus[ is] on the decision of the BIA as opposed to that of the IJ." Pulisir v. Mukasey, 524 F.3d 302, 307 (1st Cir. 2008). We review the legal and constitutional issues de novo, "but with some deference to the agency's reasonable

- 10 -

interpretation of statutes and regulations that fall within its sphere of authority." Jianli Chen v. Holder, 703 F.3d 17, 21 (1st Cir. 2012). And we review the BIA's factual findings for substantial evidence. See Mazariegos-Paiz v. Holder, 734 F.3d 57, 64 (1st Cir. 2013). The substantial evidence standard "requires us to accept the agency's factual findings . . . unless the record is such as to compel a reasonable factfinder to reach a contrary conclusion." Id. (emphasis added).

We turn directly to the BIA's lack of prejudice holding because it is dispositive of all Dorce's constitutional, statutory, and regulatory claims in his petition.[6] Dorce has conceded that a showing of prejudice is necessary for all those claims, as that is what he argued to the BIA. See, e.g., Gomez-Abrego v. Garland, 26 F.4th 39, 47 (1st Cir. 2022) (noting that "arguments not made before the BIA may not make their debut in a petition for judicial review of the BIA's final order" (quoting Ahmed v. Holder, 611 F.3d 90, 97 (1st Cir. 2010))).

Dorce raises several claims of legal error as to the BIA's no-prejudice holding. None has any merit.

Dorce first argues the BIA failed to consider the entire record in determining that Dorce had not shown prejudice. We

---

[6] Dorce's argument that the BIA improperly overlooked his statutory and regulatory claims lacks merit. His due process claim overlaps with his statutory and regulatory arguments, and all turn on the BIA's no-prejudice finding.

- 11 -

review this claim de novo and, even under this standard, we conclude the BIA opinion did not ignore anything of relevance. To the contrary, the BIA decision was explicit that it considered the proffered declarations, as it expressly said so. In fact, the BIA even expressly stated that it considered their contents, such as the representation that one declarant would testify about how Dorce "is a 'good guy,'" while another would testify to the events surrounding Dorce's firearm offense (albeit not as an eyewitness to them).

The BIA "is not required to dissect in minute detail every contention that a complaining party advances." Raza v. Gonzales, 484 F.3d 125, 128 (1st Cir. 2007). Rather, the agency need only "articulate[] its decision in terms adequate to allow a reviewing court to conclude that the agency has thought about the evidence and the issues and reached a reasoned conclusion." Id. Here, the BIA has done just that, and nothing more was required of it.[7] There is no legal requirement that the BIA also evaluate or presume that Dorce's proposed witnesses would have testified to matters beyond what their declarations said they would.

---

[7] Unlike in Dor v. Garland, 46 F.4th 38 (1st Cir. 2022), which dealt with the unrelated issue of whether the Board applied the relevant legal factors in coming to a particularly-serious-crime conclusion, here the Board applied the law to the facts in a manner that provides a "sufficiently rational explanation" for this Court to review. Id. at 49.

Further, there is no merit to Dorce's argument that the BIA committed legal error by using an incorrect prejudice standard. The BIA correctly identified the prejudice inquiry as asking whether the alleged lack of notice was "likely to have affected the outcome of the proceedings," citing Zhou Zheng v. Holder, 570 F.3d 438, 442 (1st Cir. 2009). Dorce argues the BIA nonetheless applied a heightened standard, pointing to the BIA's statement that it could not "determine that the additional testimonies of [Dorce]'s family members would have been sufficient to offset the serious, negative factors in this case" (emphasis added). This argument fails.

The BIA stated it reviewed Dorce's proffered declarations and did not see them as providing the kind of evidence "likely to have affected the outcome of the proceedings." Pulisir, 524 F.3d at 311. It explicitly concluded that the declarations failed to "offer any additional or meaningful information that was not already considered by the Immigration Judge or that would offset the negative factors in [Dorce's] case to merit relief" (emphasis added), without thereby assuming the witnesses would only repeat the words in their declarations rather than testify to the substance of them.

This leaves Dorce's argument that the record compels a conclusion as to prejudice contrary to the one the BIA reached. Dorce accepts that he has the burden to make the case that he was

prejudiced. The declarations he proffered to the BIA fail, on our deferential review of the BIA's no-prejudice finding, to meet this burden. The generalized statements by the declarants about what they would testify do not suffice to compel the conclusion that the alleged notice violation was likely to have affected the outcome of his removal proceedings.

The record supports the BIA's conclusion that the declarations failed to "offer any additional or meaningful information" that could suggest Dorce's negative factors -- including his very serious firearms conviction -- were not as concerning as they otherwise appeared to be. The declarations merely repeat, broadly, Dorce's testimony and state generally that he is a "good guy."

Finally, Dorce has not met his burden to show prejudice as to his more particularized claim that the agency should have documented his purported ex-parte videocall with his IJ. Dorce accepts that he must show prejudice from this alleged violation, if it even occurred, as he did not argue that he was not required to show such prejudice in presenting the claim to the BIA. He is unable to make such a showing.

The prejudice Dorce identifies solely is his ability to prove he was deprived of notice, as he contends that if he could show that the ex-parte hearing occurred (which he could do if the agency had put the hearing in the record), then he could show that

he could rebut the presumption of delivery of notice.  That line of reasoning misses the point.  The notice claim, as Dorce presented it to the BIA, has merit only if he can show prejudice following from the denial of notice.  Nothing about the alleged ex-parte hearing with the IJ as described by Dorce (if placed on the record) would have enhanced Dorce's ability to show that even with his prior conviction, he was deserving of cancellation of removal.

## III.

The petition for review is <u>denied</u>.


**-Dissenting Opinion Follows-**

**LIPEZ**, <u>Circuit Judge</u>, **dissenting**.   Petitioner Ritch Cardy Dorce, a citizen and native of Haiti, claims that he was denied a full and fair opportunity to prove that he is entitled to relief from removal because he did not receive written notice of his rescheduled immigration hearing, in violation of his statutory, regulatory, and constitutional rights.  Based primarily on the lack of timely notice, he argues that he is entitled to reconsideration of his request for cancellation of removal.   In denying Dorce's petition, the majority disregards a significant legal error by the Board of Immigration Appeals ("BIA") -- its failure to apply the proper analysis to Dorce's notice claim.  My colleagues then accept the BIA's inadequately reasoned conclusion that Dorce suffered no prejudice from his asserted lack of notice. Based on my review of the record and the applicable law, I believe this panel should grant Dorce's petition for relief and remand the case to the BIA for further proceedings.  I therefore dissent from my colleagues' refusal to do so.

**I.**

**A. Factual Background**

Dorce arrived in the United States at age four and was a lawful permanent resident for sixteen years before the incident that led to his removal proceedings.  On December 31, 2016, when Dorce was twenty, someone fired a handgun at a house where a New Year's Eve party was taking place.  Dorce admitted attending the

party with a friend but claimed that he left after he was involved in a fight and was not present when the shots were fired at the house. Later that night, however, Dorce posted a video of himself on social media (Snapchat) in which he was holding the gun supposedly used in the shooting and claimed to be the individual who had fired at the house. Dorce later testified that this claim was untrue, that his friend had given him the gun,[8] and that he was simply "trying to get brownie points for something [he] didn't do." He also testified -- when questioned about his contention that the gun was unloaded -- that he knew how to remove the gun's magazine and check the chamber because he had seen it done in movies.

Dorce was charged with seven offenses stemming from the New Year's Eve incident. Two charges were dismissed, and the jury acquitted him on four others: possessing ammunition without a license, assault with a dangerous weapon, malicious destruction of property, and malicious damage to a vehicle. On the single count of conviction, carrying a firearm without a license, Dorce was sentenced to a two-year term of imprisonment.

The record indicates that, before his arrest, Dorce led a difficult but lawful life in the United States. Dorce spent his

---

[8] Dorce testified that his friend came to his home after Dorce had left the party, showed him the gun, and claimed that he "had taken care of" the situation for Dorce, an apparent reference to Dorce's involvement in the fight at the party.

early years with his grandmother in Florida before moving to Massachusetts at fifteen to live with his father. According to Dorce, he stayed with his father and his father's girlfriend only a short time before he moved out because they fought often and he was afraid to be in their home.[9] He became homeless, at times staying outdoors and at times staying in shelters or with friends. Despite his own housing challenges, he volunteered to assist senior citizens at a housing complex and helped at local homeless shelters. During this period, he began a long-term relationship with a U.S. citizen, Stacey Fragile, with whom he had two children, the first when he was eighteen and the second when he was twenty-one. Although Dorce did not provide financial support to his children because he had little employment, he claims to have a close relationship with them. During his incarceration, Dorce completed a variety of rehabilitation programs, earned his high school equivalency diploma, and participated in a parents' support group.

Immediately upon his release from state custody in July 2019, Dorce was detained by Immigration and Customs Enforcement ("ICE") and charged with removability for having been convicted of a firearms offense. See 8 U.S.C. § 1227(a)(2)(C).

_____

[9] At his merits hearing, Dorce testified that his father's girlfriend asked him to leave because he was not "getting along with her."

**B. Preliminary Immigration Proceedings**

Through the summer and fall of 2019, Dorce appeared multiple times before an Immigration Judge ("IJ"). At his first two appearances, on July 25 and August 14, both by videoconference, the proceedings were continued so that Dorce could obtain counsel. On August 29, even though the attorney whom Dorce expected did not appear, the IJ went forward with the proceedings, sustained the charge of removability, and reset Dorce's case for September 19 so that he could file applications for cancellation of removal and relief based on his fear of returning to Haiti.

On September 19, the IJ again reset the matter because, she explained, "some sort of scheduling error" had resulted in Dorce's appearance by videoconference instead of in person. On September 30, Dorce appeared in person and submitted his applications for relief. The IJ advised him that his final hearing would be held on December 4 and that he would have the opportunity at that hearing to present witnesses "who can talk about positive things you've done or any testimony from anyone that you want me to hear."

Dorce claims that he expected four witnesses to appear on his behalf on December 4: his father, uncle, cousin, and Fragile, his former girlfriend and mother of his children. His father and uncle later submitted declarations stating that they went to the immigration court that day, but no hearing occurred.

As it turns out, a notice was mailed to Dorce on November 27 rescheduling his hearing to December 19. Dorce maintains that he never received that notice.[10] Rather, he claims that sometime between December 10 and 12 (or roughly in that timeframe) he met via videoconference with the IJ, who explained that he had not been brought to court on December 4 because of a scheduling error. According to Dorce, the IJ told him that she did not know his next hearing date, but that he would receive written notice from ICE. No evidence of this conversation, other than Dorce's report, appears in the administrative record.

Dorce claims that he first learned that his hearing had been rescheduled to December 19 when he called the immigration court's 1-800 number on December 16, having not received written notice. He says that he then called his sister, who had coordinated the witnesses for December 4, but she stated in her later declaration that three days was not enough time for the witnesses to make arrangements to attend the rescheduled hearing.

**C. Merits Hearing**

On December 19, still pro se, Dorce appeared in person for his final hearing. When the IJ asked if he had any additional

---

[10] A copy of the notice in the record indicates that it was "SERVED BY[] MAIL" to Dorce "c/o Custodial Officer" at the Plymouth County Correctional Facility. In his brief, Dorce states that he saw the notice for the first time when the administrative record was submitted to this court.

- 20 -

documents for the court, he responded, "Oh, my father was supposed to come, and my uncle, but I don't know if they're here yet." The IJ instructed the court officer to check the hallway, and when the officer indicated that no one was there, the IJ proceeded with the hearing. Dorce said nothing about a lack of adequate notice or that the rescheduling might have affected his witnesses' ability to attend.

The IJ questioned Dorce about his personal background and family relationships in the United States, his fear of returning to Haiti, and the firearms incident. She then turned the questioning over to government counsel, who further delved into Dorce's actions at the New Year's Eve party and pressed him on his seeming familiarity with the handgun he held in the video. The government also questioned Dorce about his relationship with Fragile and asked why she was not at the hearing. Dorce responded that "[s]he was supposed to be here."

When the government completed its questioning, the IJ asked the court officer to check the hallway again "to see if anybody is outside for Mr. Dorce's case," but, again, no one was there. The IJ asked Dorce if he had anything to add to his testimony before she took his case under advisement, and he emphasized that he had matured since the New Year's Eve incident. He stated that both he and his children had been hurt by the separation while he served his sentence and then was detained by

ICE.  The IJ asked if Dorce remained in touch with Fragile, and when he responded affirmatively, the IJ asked why she had not attended the hearing.  Dorce again responded: "She was supposed to be [here].  I don't know what happened.  She told me she would come."  Prompted by the IJ, Dorce elaborated on his relationship with Fragile and his children and concluded with the explanation that he was presently "trying to . . . prove to my family and Stac[e]y that I'm a changed person.  That I'm not the same person that was doing and thinking stupid things."

## D. The IJ's Decision

In an oral ruling rejecting Dorce's requests for relief, the IJ emphasized her skepticism concerning Dorce's account of the New Year's Eve incident.  Although the IJ found that Dorce was overall a credible witness who "answered questions responsively and candidly for the most part," she found "implausible" his testimony that he "handled a firearm for basically the first time" that night and was able to remove the magazine and check the chamber for a bullet "simply because he watched it done in movies." The IJ explained that, because of her "finding that [Dorce] gave implausible testimony and minimized some of his criminal conduct concerning [the firearms] offense," she would give less weight to "certain testimony of [Dorce] concerning . . . that offense."

The IJ then considered each of Dorce's requests for relief.  In rejecting his application for cancellation of removal

as a matter of discretion, the only ruling Dorce challenges on appeal, the IJ reviewed "the positive factors present against the negative factors."  The IJ noted the positive factors of Dorce's community work and family support, but she weighed his firearms offense "as a very significant adverse factor."  Although the IJ considered his two U.S.-citizen children as "positive equities," she pointed out that Dorce is not listed on their birth certificates and had not contributed financially to their support.  The IJ also noted a Facebook post by Dorce as "some evidence" of gang association.[11]  The IJ concluded, on balance, that the adverse factors outweighed the positive factors.

**E. The BIA's Decision**

In his appeal to the BIA, Dorce, now represented by counsel, primarily argued that he was denied a fair hearing on his applications for relief because he was not given proper notice of

---

[11] The post stated "Zoe life, Zoe gang or no gang."  When asked by government counsel, "Why'd you write that if you're not a Zoe Pound gang member," Dorce responded that "[i]t means Haitian over everything."  There is some support for Dorce's response in current usage.  See Zoe Pound, Urban Dictionary, https://www.urbandictionary.com/define.php?term=Zoe%20Pound (last visited Sept. 20, 2022) (noting that Zoe Pound is "[a] very ruthless gang that originates with Haitian[] immigrants," but that "[t]he word Zoe by itself means somebody that is of Haitian de[s]cent" and that "[m]any Zoe Pound members do not view themselves as gang members, but view themselves as a group standing up for their Haitian people").  However, the IJ "d[id] not credit" Dorce's explanation that the comment did not indicate an association with the gang.  The record contains no other evidence of gang involvement by Dorce.

his December 19 hearing and learned of the date only three days in advance, when he took the initiative to call the immigration court's 1-800 number. The lack of adequate notice was prejudicial, he asserted, because none of his witnesses could arrange to attend his hearing on such short notice. Accordingly, Dorce argued, his removal proceedings were "fundamentally unfair, in violation of his statutory and due process rights, because [the notice error] essentially prevented him from presenting evidence in support of his claims."

Along with his brief and his own declaration, Dorce submitted declarations from his father, sister, uncle, and Fragile that generally described the testimony they would have provided in support of his applications for relief. In various ways, each emphasized that Dorce's criminal conviction did not reflect his true character. His uncle noted that "[h]e made a bad choice once" and "deserves a second chance." His sister and father described him as "a good guy" who wanted to remain in the United States so that he could support and care for his children. Fragile stated that she planned to testify about his relationship with his family, including "how important it is that he gets to be here for our children," and about "all the steps that [Dorce] has made to obtain his education and to learn to be able to earn an income." She also stated that she "would have been able to testify about his

criminal conviction" and "could have explained to the judge why [she] knew that [Dorce] isn't dangerous."

Dorce's sister and Fragile also emphasized that the late notice of the changed hearing date was problematic. Fragile explained that she needed more than three days "to take time off from work and school and find childcare," and Dorce's sister stated that "[e]verybody works -- there was no way for them to get time off from their jobs in time for them to make it to that hearing." Dorce's sister also stated that her brother had told her about the "video court hearing" that took place "[a] few days" after December 4, when Dorce said he had "talked to the judge" but still did not know when his next hearing would be.

In rejecting Dorce's lack-of-notice claim, the BIA described as "inconsistent to the evidence in the record" both his assertion that he did not learn the date of his rescheduled hearing until he called the immigration court and his description of the video call with the IJ. The BIA pointed out that Dorce had not notified the IJ at the December 19 hearing "that he had not received the [mailed] notice and that he was unprepared to proceed with his case." The BIA further noted that the hearing notice had been sent more than a week before Dorce claimed to have spoken with the IJ and, hence, "if such video call had taken place, it is not credible that the Immigration Judge was not aware" of his next

- 25 -

hearing date. The BIA thus concluded that Dorce had not shown that a procedural error occurred.

Despite finding no error, the BIA went on to cursorily suggest that even if he was denied the opportunity to present witness testimony at the hearing, he suffered no prejudice. The BIA stated that the declarations from Dorce's father and uncle failed to provide "any additional or meaningful information that was not already considered by the Immigration Judge or that would offset the negative factors" in his case. It discounted Fragile's declaration because she provided no details concerning the information she would have offered on the criminal conviction and Dorce's relationship with his children. Given these "deficiencies" in the declarations, the BIA found no basis for concluding that the testimony of Dorce's potential witnesses would have offset "the serious, negative factors in this case."

## II.

Dorce argues that a lack of notice that his merits hearing had been changed from December 4 to December 19 -- until he called to inquire -- prevented him from presenting witness testimony that was likely to have made a difference in the IJ's balancing of the equities in his case. I begin with the notice issue before turning to the question of prejudice. Although Dorce frames his notice argument in constitutional, statutory, and regulatory terms, and the BIA expressly addressed the claims as a

matter of due process, I anchor my analysis solely in the requirements of the Immigration and Nationality Act ("INA"). See Aponte v. Holder, 610 F.3d 1, 5 (1st Cir. 2010) (noting that "courts should not decide constitutional issues when this can be avoided" (quoting United States v. Vilches-Navarrete, 523 F.3d 1, 9 n.6 (1st Cir. 2008))).

## A. Legal Background

The INA provides noncitizens with certain procedural protections in their removal proceedings. They are entitled to written notice of "[t]he time and place at which the proceedings will be held," 8 U.S.C. § 1229(a)(1)(G)(i), and written notice of a change or postponement of a scheduled proceeding, see id. § 1229(a)(2)(A)(i). The INA specifies that these notices be given in person, but "if personal service is not practicable," notice may be given "through service by mail" to either the noncitizen or his counsel of record. See id. §§ 1229(a)(1), 1229(a)(2)(A). The INA also grants a noncitizen "a reasonable opportunity . . . to present evidence on [his] own behalf." Id. § 1229a(b)(4)(B).

Of particular relevance to this case, there is a presumption, established through judicial and administrative caselaw, "that, in the absence of evidence to the contrary, a notice provided by a government agency is deemed to have been placed in the mail on the date shown on the notice and received within a reasonable time thereafter." Loubriel v. Fondo del Seguro

del Estado, 694 F.3d 139, 143 (1st Cir. 2012); see also Matter of M-R-A-, 24 I. & N. Dec. 665, 671 (BIA 2008) ("We have recognized that '[a] letter properly addressed, stamped and mailed is presumed to have been duly delivered to the addressee.'" (alteration in original) (quoting Matter of M-D-, 23 I. & N. Dec. 540, 546 (BIA 2002))). For items sent via certified mail -- a service that provides proof of delivery or attempted delivery -- there is "a 'strong presumption' of effective service," and rebutting the presumption requires "substantial and probative evidence." Matter of M-R-A-, 24 I. & N. Dec. at 672 (quoting Matter of Grijalva, 21 I. & N. Dec. 27, 37 (BIA 1995)).[12] A weaker presumption attaches when items are sent by regular mail. See id. at 673; see also Kozak v. Gonzáles, 502 F.3d 34, 36 (1st Cir. 2007) (explaining that the stronger presumption of effective service that applies to certified mail does not apply to regular mail).

In Matter of M-R-A-, the BIA concluded that "when a respondent seeks to reopen proceedings based on a claim of lack of receipt of notice" sent by regular mail, "the question to be determined is whether the respondent has provided sufficient evidence to overcome the weaker presumption of delivery." 24 I.

[12] Before 1997, the INA required that hearing notices be served in person or sent by certified mail. See Kozak v. Gonzáles, 502 F.3d 34, 36 (1st Cir. 2007). Under current law, notices may be served by regular mail. See id. (citing 8 U.S.C. § 1229(a)(1)).

& N. Dec. at 673.[13]   Drawing from the precedent of multiple circuits, including our court's decision in Kozak, the BIA went on to hold that "all relevant evidence submitted to overcome the weaker presumption of delivery must be considered."  Id. at 674. The BIA cautioned against "[a]n inflexible and rigid application of the presumption of delivery . . . when regular mail is the method of service of a Notice to Appear or Notice of Hearing," and it provided a list of non-exclusive factors to be considered:

> (1) the respondent's affidavit; (2) affidavits from family members or other individuals who are knowledgeable about the facts relevant to whether notice was received; (3) the respondent's actions upon learning of the in absentia order, and whether due diligence was exercised in seeking to redress the situation; (4) any prior affirmative application for relief, indicating that the respondent had an incentive to appear; (5) any prior application for relief filed with the Immigration Court or any prima facie evidence in the record or the respondent's motion of statutory eligibility for relief, indicating that the respondent had an incentive to appear; (6) the respondent's previous attendance at Immigration Court hearings, if applicable; and (7) any other circumstances or evidence indicating possible nonreceipt of notice.

---

[13] In both Matter of M-R-A- and Kozak, the specific issue was the showing required of a noncitizen who seeks to reopen proceedings based on lack of notice after having failed to appear for an immigration hearing in which the IJ ordered removal in absentia.  See Matter of M-R-A, 24 I. & N. Dec. at 666-77, 673-74; Kozak, 502 F.3d at 35-36.  With respect to the presumption afforded to the agency's mailings, I see no reason to limit the principle to the precise factual situation of in absentia removal. Here, as in the context of in absentia removal, the question is whether the noncitizen received a mailing from immigration authorities.

Id.  The BIA emphasized that these factors are merely illustrative and that "[e]ach case must be evaluated based on its own particular circumstances and evidence."  Id.

**B.  Notice to Dorce**

As described above, the BIA rejected Dorce's notice claim on the ground that his account of what happened was "inconsistent to the evidence in the record."  The BIA cited three factors to demonstrate the inconsistency: (1) the absence of evidence that the written notice of the rescheduled hearing, which the record indicated had been mailed to Dorce on November 27, was undeliverable; (2) Dorce's failure to tell the IJ "that he had not received the notice and that he was unprepared to proceed with his case," and (3) the implausibility of Dorce's report that the IJ did not know the new hearing date at the time of the claimed video call.

I focus primarily on the first of these rationales, albeit briefly addressing the other two as well.  In citing the lack of evidence that Dorce's rescheduling notice was undeliverable, I understand the BIA to be invoking the presumption that a properly addressed mailing reaches the addressee in due course.  See supra.  Apparently to support relying on the presumption, the BIA noted that Dorce did not raise the notice issue at his hearing.  However, there is no indication in its opinion that the BIA complied with the directive in Matter of M-

R-A- to evaluate "all relevant evidence" to determine whether the presumption of mail delivery has been rebutted. 24 I. & N. Dec. at 674. Multiple facts unremarked upon by the BIA warranted attention in its analysis. See Sihotang v. Sessions, 900 F.3d 46, 51 (1st Cir. 2018) ("While it remains true that the BIA need not 'dissect in minute detail every contention that a complaining party advances,' it cannot turn a blind eye to salient facts." (citation omitted) (quoting Xiao He Chen v. Lynch, 825 F.3d 83, 88 (1st Cir. 2016))).

First, the BIA did not acknowledge that the IJ found Dorce to be generally a credible witness who "answered questions responsively and candidly for the most part," the exception being his account of "his criminal conduct and the circumstances surrounding his criminal offense." Indeed, the IJ stated that "this record would not support an adverse credibility finding." Further, the record is consistent with Dorce's assertion that he did not see the November 27 notice until his attorney obtained the administrative record to prepare his petition for review. Unlike the record copy of the notice for the December 4 hearing -- which is stamped as an exhibit dated December 19 -- the copy of the November 27 notice does not contain a date stamp. Although that difference obviously does not prove that the rescheduling notice

never reached Dorce via mail delivery,[14] it is a relevant factor in assessing the credibility of his assertion.

Second, the BIA did not address the evidence showing Dorce's diligence in preparing for the December 4 hearing -- arranging, through his sister, for witness testimony -- or the eagerness of his supporters to appear on his behalf. According to their declarations, Dorce's father and uncle stayed at the immigration court all day on December 4, and Fragile made an on-the-record appearance at the proceeding held on September 19. Dorce presumably was highly motivated to ensure his witnesses' attendance at his hearing because he had been told expressly that it would help his case to offer testimony from "anybody who can talk about positive things you've done."[15]  Dorce's diligence and

---

[14] Most of the documents in the record are not individually stamped, including multiple prior notices of Dorce's scheduled appearances in immigration court (among them, another copy of the notice for December 4).  However, the stamped December 4 notice, with a mailing date of September 30, is chronologically the latest notice that Dorce reports having received.  The fact that it was stamped could indicate that it was the latest one in his file at the time of his merits hearing.

[15] On September 30, the IJ told Dorce that his merits hearing would be held on December 4, explained the nature of that hearing, and told him that he "can have anybody come and speak on [his] behalf."  The IJ explained, inter alia, that the considerations for cancellation of removal were "like[] a scale," and then elaborated:

> On one side's going to be all the positive
> factors in your case, such as your length of
> time [in the United States], how old you were
> when you first came to the United States, what

- 32 -

motivation, and that of his family members, is relevant in evaluating whether their failure to appear on December 19 was attributable to a lack of proper notice -- and thus relevant to whether Dorce rebutted the presumption that the rescheduling notice was "mail[ed] on the date shown on the notice and received within a reasonable time thereafter." Loubriel, 694 F.3d at 143; cf. Matter of M-R-A-, 24 I. & N. Dec. at 674 (giving significance to indicia of the noncitizen's "incentive to appear").

Third, the BIA did not address Dorce's sister's declaration, which corroborated his account of not having received written notice of the rescheduled hearing. In her declaration, she described two relevant phone calls with her brother: the first when Dorce told her about his videoconference with the IJ, and the

family members you have here, things you may have done for your community, against the negative side, which would be the seriousness of your criminal history, how recent it is, whether you've shown rehabilitation. Rehabilitation could go -- could go, really, in either column, so if you've shown good rehabilitation, that goes on the positive side. If you show lack of rehabilitation, well, that's going to go on the negative side. And the cancellation case, basically, whichever way that scale tips, is the way the [c]ourt rules, so it's like a balancing of the positives against the negatives. Okay? So anybody who can talk about positive things you've done or any testimony from anyone that you want me to hear, I will hear on December 4th. Okay?

second "on about December 16," when he told her he had just learned his new hearing date. Whatever its weight given the sibling relationship, this corroboration should have been part of the BIA's calculus in assessing the credibility of Dorce's contention that he never received the written notice. See Matter of M-R-A-, 24 I. & N. Dec. at 674 (including as factors relevant to whether the presumption of mail delivery has been rebutted "the respondent's affidavit [and] affidavits from family members or other individuals who are knowledgeable about the facts relevant to whether notice was received")[16]; cf. 8 U.S.C. § 1158(b)(1)(B)(iii) (providing that, in making a credibility determination under the INA, the factfinder must "consider[] the totality of the circumstances, and all relevant factors").

Finally, the BIA did not address the evidence that Dorce had previously experienced a significant delay in receiving immigration documents while detained. At a hearing in August 2019, Dorce told the IJ that documents sent to him at the Plymouth County

---

[16] Although Dorce's and his family's statements are unsworn declarations rather than sworn affidavits, each states that it is "[s]igned under the pains and penalties of perjury" and, regardless of their weight, the documents are certainly "relevant evidence" that "must be considered." Matter of M-R-A-, 24 I. & N. Dec. at 674; cf. Lopes v. Gonzales, 468 F.3d 81, 85-86 (2d Cir. 2006) (per curiam) ("Although an affidavit of non-receipt might be insufficient by itself to rebut the presumption [of receipt], it does raise a factual issue that the BIA must resolve by taking account of all relevant evidence . . . .").

Correctional Facility, in a mailing dated July 3, were not given to him until July 16 -- nearly two weeks later. Given this prior issue with timely receiving mail, there is nothing implausible about the November 27 notice -- presumably mailed on the day before Thanksgiving -- having gone entirely astray in the mail-processing system at the same detention facility. As our court previously has observed, "[a]though most mail reaches its intended destination, it is commonsensical that at least some does not." Kozak, 502 F.3d at 36.[17]

To be sure, the BIA reasonably considered the fact that Dorce did not tell the IJ that late notice of the new hearing date could explain his witnesses' nonappearance. The agency's error was, rather, to focus on that omission without also considering the other relevant evidence in the record. In context, even Dorce's failure to raise the notice problem permits a different

---

[17] The government notes that Dorce did not mention this previous mail delay in his brief to the BIA and asserts that the agency therefore cannot be faulted for failing to consider it. According to Dorce, however, he had no knowledge of the November 27 mailing at the time he submitted his appeal to the BIA. If that assertion is truthful, he would have had no reason to discuss the mailing presumption. In other words, because Dorce claims that he saw the November 27 notice for the first time when the administrative record was filed in this case in response to his petition for review, his argument before the BIA could not have focused on the mailing. The agency, on the other hand, had access to the full record and, in choosing to rely on the presumption of delivery, was obliged to consider "all relevant evidence" in assessing its applicability. Matter of M-R-A-, 24 I. & N. Dec. at 674.

inference than that drawn by the BIA. The record indicates that Dorce believed at the outset of the hearing that his witnesses would be arriving. Once the hearing was underway, Dorce could have assumed that he had no choice but to proceed and that it would not help his cause to make excuses for his witnesses' nonappearance. The fact that he was brought to the hearing from the detention facility -- i.e., that the government needed to make the arrangements for him to appear -- could have added to his reticence about interrupting the proceedings. Dorce had previously experienced a glitch when he was mistakenly not brought to court for a scheduled in-person proceeding, see Section I.B supra, which could have given him reason to believe that such appearances were difficult to arrange and that he might not be given another opportunity to present his case.

Moreover, the BIA's third rationale for rejecting Dorce's notice claim as "inconsistent to the evidence" -- that the IJ would have known about the changed hearing date at the time of the purported video call around December 10 -- is presented as an assumption based solely on the fact that the rescheduling notice was dated November 27.[18] Although the BIA indicated some skepticism

---

[18] This gap concerning the IJ's knowledge easily could have been filled by means of a limited remand to the IJ, who could have either refuted or confirmed Dorce's account of the videoconference.

- 36 -

about whether the conversation had in fact occurred -- with its comment "if such video call had taken place" -- it did not reject that portion of Dorce's account as incredible and instead focused on the IJ's likely knowledge of the new date. But the BIA did not identify any support for its assumption that once the hearing was rescheduled, the IJ would have known the new hearing date more than a week in advance. See Jabri v. Holder, 675 F.3d 20, 24 (1st Cir. 2012) (noting the need for "specific and cogent reasons why an inconsistency, or a series of inconsistencies, render the alien's testimony not credible" (quoting Stanciu v. Holder, 659 F.3d 203, 206 (1st Cir. 2011))). For example, the BIA did not point to any immigration court norms suggesting that, despite a heavy caseload, the IJ would necessarily have had Dorce's new hearing date at hand. See, e.g., Valarezo-Tirado v. Att'y Gen., 21 F.4th 256, 263 (3d Cir. 2021) (recognizing that "the IJ and BIA have a tremendous caseload and very crowded dockets"); Cui v. Mukasey, 538 F.3d 1289, 1295 (9th Cir. 2008) (noting "the crowded docket of the immigration courts").

In sum, the BIA committed legal error in failing to consider "all relevant evidence" concerning Dorce's claim that he did not receive the rescheduling notice. Matter of M-R-A-, 24 I. & N. Dec. at 674. Accordingly, given that the BIA's prejudice assessment also was flawed, as I explain below, the BIA should have to reconsider Dorce's notice claim on remand. See Dakaj v.

Holder, 580 F.3d 479, 484 (7th Cir. 2009) (stating that the lack-of-notice "determination is within the Board's province, at least in the first instance," but that "the Board was required to consider the[] relevant factors . . . and to explain its decision in light of them"); see generally Aponte, 610 F.3d at 8 (observing that "the BIA must . . . make certain that [the petitioner] receives the full benefit of the administrative process that Congress has elected to provide for [him]").

## C. Prejudice[19]

In reviewing the BIA's prejudice finding, I presume -- as do my colleagues -- that the pertinent prejudice inquiry is whether any notice violation was "likely to have affected the

_____

[19] Dorce argues that if he successfully rebuts the presumption of properly delivered notice, he is entitled to a new hearing on cancellation of removal without regard for whether the notice violation was prejudicial. As the government points out, however, Dorce presumed in his appeal to the BIA that a showing of prejudice is necessary. The government thus argues that Dorce failed to exhaust his contention that prejudice is not required for his notice claim. I agree that Dorce's position before the BIA precludes us from considering his argument that a prejudice inquiry is unnecessary. See, e.g., Gomez-Abrego v. Garland, 26 F.4th 39, 47 (1st Cir. 2022) (noting that "arguments not made before the BIA may not make their debut in a petition for judicial review of the BIA's final order" (quoting Ahmed v. Holder, 611 F.3d 90, 97 (1st Cir. 2010))). I therefore assume that Dorce was obligated to show prejudice. However, because I believe the BIA should have been required to revisit the question of prejudice on remand, see infra, I also believe Dorce should have been given the opportunity to re-assert his contention that a prejudice showing is not a prerequisite for the new hearing he seeks.

outcome of the proceedings." Pulisir v. Mukasey, 524 F.3d 302, 311 (1st Cir. 2008).

As the majority recognizes, the BIA assessed prejudice based solely on the substance of the declarations that Dorce submitted, without considering how in-person testimony by those witnesses -- i.e., the "evidence on [his] own behalf" that he claims he would have presented if he had received proper written notice, 8 U.S.C. § 1229a(b)(4)(B) -- might have affected the IJ's weighing of factors. Declarations, however, do not capture the benefits of live, interactive testimony by witnesses at a hearing. There is inherent value in live testimony -- particularly such testimony in support of a pro se litigant who has no one else present to speak on his behalf. Indeed, it is a fundamental premise of our adversarial legal system that in-person testimony is the most effective way of getting at the truth of a matter -- including through a factfinder's assessment of witness credibility.

Moreover, the value of in-person testimony is highlighted by the facts of this case. The IJ took an active role in questioning Dorce -- presumably because he was unrepresented at his hearing -- and she showed a particular interest in the details of the New Year's Eve incident and his relationship with Fragile. Fragile's declaration clearly reveals that she had relevant testimony to offer about Dorce's support of her and their children,

and she also stated that she "could have explained to the judge why [she] knew that [Dorce] isn't dangerous." I have no doubt that the IJ would have pressed Fragile -- as well as Dorce's other witnesses -- on those topics.[20] Indeed, the IJ had an obligation to fully explore those highly relevant facts, particularly when faced with a pro se applicant for relief. See Mekhoukh v. Ashcroft, 358 F.3d 118, 129 n.14 (1st Cir. 2004) (noting that the IJ, "unlike an Article III judge, is not merely the fact finder and adjudicator but also has an obligation to establish the record" (quoting Yang v. McElroy, 277 F.3d 158, 162 (2d Cir. 2002))); see also Quintero v. Garland, 998 F.3d 612, 623 (4th Cir. 2021) (noting that "every circuit to have considered the issue as well as the [BIA]" has recognized "immigration judges' duty to develop the record"); id. at 622 (holding that "immigration judges have a legal duty to develop the record, which takes on particular importance in pro se cases").[21]

---

[20] Their testimony also may have reinforced Dorce's explanation that the Facebook post noted by the IJ did not, in fact, reflect gang membership. See supra note 11.

[21] In its lengthy discussion in Quintero, the Fourth Circuit noted that the courts and the BIA have grounded the IJ's obligation to develop the record "principally" in 8 U.S.C. § 1229a(b)(1), which directs IJs to "'administer oaths, receive evidence, and interrogate, examine, and cross-examine the [non-citizen] and any witnesses' in removal proceedings." Quintero, 998 F.3d at 623 (alteration in original) (quoting 8 U.S.C. § 1229a(b)(1)). The court in Quintero also reported two other rationales for that obligation. First, it observed that other circuits "have held that immigration judges' duty to develop the record is an essential

- 40 -

It also is likely that the IJ would have elicited elaboration from these witnesses that would have been favorable to Dorce. This prediction is based squarely on the record. For example, the IJ gave minimal credit to Dorce for his role as a parent because he had not provided financial support to his children. According to Fragile's declaration, she would have explained the importance of his collaboration in parenting, including providing childcare when she returned to school, and his efforts "to obtain his education and to learn to be able to earn an income."

The BIA also did not consider that the mere appearance of supporting family members, even absent new information, was likely to have advanced Dorce's position in the "balancing of the positives against the negatives" that the IJ explained she would be performing. As previously noted, in telling Dorce what the merits hearing would entail, the IJ had explained the importance of securing witnesses "who can talk about positive things you've

requirement of a full and fair hearing to which noncitizens in removal proceedings are entitled under the Due Process Clause of the Fifth Amendment." Id. at 623-24; see also id. at 624 (noting that the First Circuit in Mekhoukh, 358 F.3d at 129-30, "consider[ed] whether the petitioner's 'hearing was fundamentally unfair because the immigration judge failed to fully develop the record'"). Second, the Quintero panel noted that "the earliest and most influential circuit-court decisions establishing immigration judges' duty to develop the record [had] relied on an analogy to the Social Security disability context, where administrative law judges have a similar obligation." Id. at 624.

done."  Assurances by others that the New Year's Eve incident was aberrant behavior and that he had matured while in custody would have corroborated Dorce's credibility on those points.  As we have previously observed in a different immigration context, "evidence [that] is cumulative of preexisting record evidence . . . may nonetheless be material."  Perez v. Holder, 740 F.3d 57, 62 n.1 (1st Cir. 2014); cf. Amouri v. Holder, 572 F.3d 29, 36-37 (1st Cir. 2009) (rejecting a prejudice claim where the petitioner relied only on "vague assertions" about additional witnesses and documents without "concrete demonstration that such witnesses and documents existed, were not available at the hearing, and would have supported his story").

The majority is therefore entirely mistaken when they assert that "the BIA opinion did not ignore anything of relevance" on the issue of prejudice.  Quite to the contrary, there is no indication in the BIA's opinion that it considered the potential impact of in-person testimony, particularly the fact that the presence of Dorce's family members at the hearing would have allowed the IJ to draw them out and assess their credibility.  Nor is there any basis for reading into the BIA's opinion a determination that in-person testimony would have made no difference to the IJ's balancing of factors.[22]

_____

[22] To the extent the BIA was performing its own assessment of the competing factors, it could not properly do so without

- 42 -

By failing to consider the impact of in-person testimony, the BIA performed an incomplete and, hence, fatally flawed prejudice analysis. See Dor v. Garland, 46 F.4th 38, 44 (1st Cir. 2022) (quoting Berhe v. Gonzales, 464 F.3d 74, 87 (1st Cir. 2006)), for the proposition that "the adequacy of the Board's reasoning is a legal question that we may review"); Rodríguez-Villar v. Barr, 930 F.3d 24, 28 (1st Cir. 2019) ("Although the agency is not required to discuss every piece of evidence, it must, at a minimum, 'fairly appraise the record' and 'cannot turn a blind eye to salient facts.'" (quoting Sihotang, 900 F.3d at 51)). Of course, because the BIA found no notice error, it is unsurprising that its prejudice analysis was cursory. Now, it is my colleagues -- not the BIA -- who definitively conclude that in-person testimony would have made no difference to the IJ in balancing Dorce's positive and negative factors. What is more, with that definitive conclusion, my colleagues are saying, in effect, that in-person character testimony by people who know a petitioner best is irrelevant to immigration proceedings. I cannot overstate my dismay at this misguided and damaging suggestion.

Put simply, given the omissions in the BIA's analysis, my colleagues are wrong to uphold the BIA's rejection of Dorce's notice claim on the ground that he failed to show the requisite

---

considering whether elaborated, in-person testimony would strengthen the factors in favor of Dorce's claim for relief.

prejudice.  The proper disposition is a remand.  See <u>Ali</u> v. <u>Garland</u>, 33 F.4th 47, 62-63 (1st Cir. 2022) (concluding that "the prudent course is to vacate and remand for the BIA to address the aspects of the record that have not been given their proper consideration" where the record would permit a finding for the petitioner if the omitted evidence had been addressed).[23]

## III.

In concluding that a remand is necessary for the BIA to reconsider Dorce's application for cancellation of removal, I am not suggesting, as the majority intimates, that the BIA must "dissect in minute detail every contention that a complaining party advances."  <u>Raza</u> v. <u>Gonzalez</u>, 484 F.3d 125, 128 (1st Cir. 2007). In this case, however, the BIA not only committed legal error in addressing Dorce's notice claim, but it also neglected to fully consider the harm Dorce suffered in consequence of that error -- including, most significantly, the deprivation of in-person

---

[23] Dorce asserts that the BIA also committed legal error by using an incorrect prejudice standard, pointing to the passage in the BIA's decision that summarizes its assessment of prejudice for the cancellation-of-removal claim.  The BIA stated that it could not "determine that the additional testimonies of [Dorce]'s family members would have been sufficient to offset the serious, negative factors in this case."  The government appears to acknowledge that the "sufficient to offset" formulation could suggest a higher level of certainty than the applicable standard of "likely to have affected the outcome."  However, as the government emphasizes, the BIA articulated the correct standard in two other places in its decision.  I therefore view "sufficient to offset" simply as careless language, not use of an improper standard.

testimony on his behalf. Where the BIA's decision fails to show that it considered important aspects of the record, we can -- and should -- demand that it do so. See Sihotang, 900 F.3d at 51 (observing that the BIA "cannot turn a blind eye to salient facts").

Accordingly, we should be granting Dorce's petition for review and remanding to the BIA for reconsideration of Dorce's claim that he did not receive written notification of his rescheduled merits hearing and, hence, was denied his right to "a reasonable opportunity . . . to present evidence on [his] own behalf." 8 U.S.C. § 1229a(b)(4)(B). And, if the BIA determined on remand that Dorce had rebutted the presumption that the rescheduling notice was delivered, it should also be required to revisit its incomplete prejudice determination.

Because my colleagues instead deny Dorce's petition, improperly preventing him from fully presenting his case for relief, I respectfully dissent.