**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 21-3166

_____

SITU KAMU WILKINSON,

Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA

_____

On Petition for Review of a
Decision of the Board of Immigration Appeals
(Agency Case No. A216-647-581)
Immigration Judge:  Robert M. Lewandowski

_____

Submitted Under Third Circuit L.A.R. 34.1(a) on
June 23, 2022
On Remand from the Supreme Court of the United States
on March 19, 2024
Argued after Remand on December 9, 2024

_____

Before: RESTREPO, BIBAS, and McKEE, *Circuit
Judges.*

(Opinion filed: March 11, 2025)

Rhonda F. Gelfman
9221 Southern Orchard Road
Davie, FL 33328

Jesse A. Lempel [Argued]
Goodwin Procter
100 Northern Avenue
Boston, MA 02210

Jaime A. Santos
Rohiniyurie Tashima
Goodwin Procter
1900 N Street NW
Washington, DC 20036
        *Counsel for Petitioner*

Corey L. Farrell [Argued]
Jaclyn G. Hagner
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044
        *Counsel for Respondent*

_____

OPINION OF THE COURT
_____

McKEE, *Circuit Judge.*

Situ Kamu Wilkinson, who has resided in the United States for over two decades, mostly without legal status, faces removal to the Republic of Trinidad and Tobago. He petitioned this Court to review the Board of Immigration Appeals' determination that he is ineligible for cancellation of removal because he failed to establish one of the statutory prerequisites to relief: that his removal would cause "exceptional and extremely unusual hardship" to a qualifying relative in the United States. For the reasons that follow, we will deny the petition for review.[1]

---

[1] We previously dismissed his petition based upon our conclusion that we lacked jurisdiction to review the IJ's discretionary determination that Wilkinson's circumstances did not rise to the level of an "exceptional and extremely unusual hardship" as required by 8 U.S.C. § 1229b(b)(1)(D). The Supreme Court reversed, holding that the IJ's denial of relief presented a mixed question of law and fact that was reviewable under 8 U.S.C. § 1252(a)(2)(D), and remanded for us to review the IJ's decision under an appropriately deferential standard. *Wilkinson v. Garland*, 601 U.S. 209, 225–26 (2024). The Court did not identify the standard of review that should govern our analysis. We write precedentially to clarify that standard. As we explain below, we now hold that the appropriate standard of review is whether the IJ's ruling is supported by substantial evidence. Applying that standard, we conclude that substantial evidence does support the IJ's decision. We must therefore deny the petition for review.

## I.    Factual Background

Wilkinson was born in the Republic of Trinidad and Tobago and lived there for nearly thirty years. Following an encounter with Trinidadian police that made him fear for his safety, he fled his home country. He entered the United States on a tourist visa on March 15, 2003. Shortly thereafter, Wilkinson was accused of a crime—he claims, wrongly—and incarcerated in the United States for four months. Those charges were ultimately dismissed, but his passport was purportedly thrown away while he was incarcerated. Wilkinson claims that this caused him to overstay his visa.

After his release from custody, Wilkinson established a life in the United States. He fathered a son, M., who is a U.S. citizen. Initially, Wilkinson and M. lived in Pennsylvania together with M.'s mother, Kenyetta Watson. When M. was two, his parents decided that he and Watson should move to New Jersey, near Watson's mother, Tracy Collins, to give M. "a better quality of life."[2] Wilkinson stayed in Pennsylvania, where he worked. Nevertheless, he remained very involved with M., whom he visited every weekend. Despite the distance, the two maintained a close relationship.

Watson currently has custody of M. Although there is no court-ordered child-support arrangement, Wilkinson has historically sent $1,200 per month to Watson and M. Watson testified before the Immigration Judge that Wilkinson helped support their son with money, "transportation, clothing, and

---

[2] AR 53.

4

great parenting."[3]   When the record was created, Watson was not formally employed.

M. has severe asthma that requires hospitalizations several times per year.  He also has eczema, requiring "parental attention and support with bathing."[4]  M. has state-provided health insurance; thus, Wilkinson does not pay for M.'s medical care.  In addition to M.'s problems, Watson suffers from depression.

In July 2019, police found drugs in a house Wilkinson was repairing.  Wilkinson denied involvement with the drugs, and claimed he was simply "in the wrong place at the wrong time."[5]  Although charges were withdrawn, the arrest brought Wilkinson to the attention of immigration authorities, who initiated removal proceedings against him.

About a month after Wilkinson's arrest and detention, M. began to exhibit troubling behavior.  Collins observed that M. "ha[d] been sad, acting out, and breaking things."[6]  M.'s teacher began texting Watson about M.'s lack of focus at school and suggested M. talk to a counselor.  Watson opted not to pursue counseling but agreed that Wilkinson's absence was causing her son to suffer.  M. subsequently corroborated Watson's belief.  M. told her that he was sad because he could not see his father and did not want his father to be sent to a different country.

---

[3] AR 55.
[4] AR 55; *see also id.* at 244.
[5] AR 53.
[6] AR 56.

If Wilkinson is removed, M. will remain in the United States. Watson expressed concern that her son does not have other male role models and that he needs his father. In addition, the family would suffer financially. Watson would need to find a job, as well as childcare for M., and would no longer be able to rely on Wilkinson as a second caregiver.

## II.    Procedural History

On November 9, 2020, the Department of Homeland Security charged Wilkinson as removable for overstaying his visa. Wilkinson conceded his removability under 8 U.S.C. § 1227(a)(1)(B) but sought cancellation of removal, among other forms of immigration relief.[7] Wilkinson is eligible for cancellation of removal if he:

> (A) has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of [his] application;
>
> (B) has been a person of good moral character during such period;

---

[7] Wilkinson also sought asylum, withholding of removal, and protection under the Convention Against Torture, but failed to establish that he qualified for that relief. *See Wilkinson v. Att'y Gen.*, No. 21-3166, 2022 WL 4298337, at *2 (3d Cir. Sept. 19, 2022).

(C) has not been convicted of [certain specified criminal offenses]; and

(D) establishes that removal would result in exceptional and extremely unusual hardship to [his] spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence.[8]

DHS stipulated that Wilkinson satisfied the first three statutory criteria, but disputed whether he could show that the removal would cause "exceptional and extremely unusual" hardship to M. as required by subsection (D).

The IJ denied Wilkinson's request for cancellation of removal. The IJ found that Wilkinson was removable as charged, that testimony from Wilkinson, Watson, and Collins was credible, and that Wilkinson satisfied the first three statutory prongs. But the IJ concluded that the hardship to M. was not exceptional and extremely unusual as required under the fourth prong, and therefore that Wilkinson was ineligible for relief. The BIA affirmed without opinion, leaving the IJ's decision as the final agency determination.

---

[8] 8 U.S.C. §§ 1229b(b)(1)(A)–(D). Even if Wilkinson satisfies these statutory criteria, the agency still must decide whether to grant the relief as a discretionary matter. The number of individuals granted such relief each fiscal year is limited to 4,000. *See* 8 U.S.C. § 1229b(e)(1).

Wilkinson petitioned this Court for review. As we noted at the outset, we dismissed the petition with respect to cancellation of removal based on our understanding that the IJ's hardship decision was discretionary and therefore unreviewable.[9] The Supreme Court reversed, vacated our prior judgment, and remanded for further proceedings.[10]

## III.  Discussion

We have jurisdiction to review the IJ's hardship determination pursuant to 8 U.S.C. § 1252(a)(1) and (2)(D) as clarified by the Supreme Court's remand. However, our jurisdiction is limited to determining whether the established facts satisfy the statutory standard, and we may not review the underlying factual findings.[11]

### A. Standard of Review

The Supreme Court instructed that because the mixed question before us "is primarily factual," our review must be "deferential."[12] The Court did not, however, specify which deferential standard applies. Moreover, subsequent decisions by our sister appellate courts have failed to agree on the

---

[9] *Wilkinson*, 2022 WL 4298337, at *1. This Court denied the petition with respect to other sources of immigration relief because Wilkinson failed to show that he was a member of a distinct "particular social group." *Id.* at *2.

[10] *Wilkinson*, 601 U.S. at 226.

[11] 8 U.S.C. § 1252(a)(2)(B)(i); *see also Wilkinson*, 601 U.S. at 222 ("[A] court is still without jurisdiction to review a factual question raised in an application for discretionary relief.").

[12] *Wilkinson*, 601 U.S. at 225.

applicable standard. Instead, those courts have applied unspecified deferential review.[13] We therefore assess in the first instance whether to review the hardship determination for substantial evidence, as the government urges, or for abuse of discretion, as Wilkinson urges.

Supreme Court precedent suggests that substantial evidence is the appropriate standard. Two provisions of the Immigration and Nationality Act inform our discussion. First, the INA "strips courts of jurisdiction to review 'any judgment regarding the granting of relief' under provisions including 8

---

[13] *See, e.g.*, *Figueroa v. Garland*, 119 F.4th 160, 166 n.7 (1st Cir. 2024) ("We need not decide here precisely what deferential standard of review should govern because we reach the same conclusion regardless."); *Carrera Hernandez v. Garland*, No. 23-6890-ag, 2024 WL 4588492, at *2 (2d Cir. Oct. 28, 2024) ("Given the 'more deferential standard of review' that applies in this context . . . we find no error in the agency's determination.") (quoting *Wilkinson*, 601 U.S. at 222). Wilkinson suggests that these decisions form a consensus around abuse of discretion. This overreads even the cases he cites, which explicitly "leave to future decisions the task of sorting out how to apply the standard of review discussed in *Wilkinson*" because the outcome would be the same regardless. *Cortes v. Garland*, 105 F.4th 124, 134 (4th Cir. 2024); *see also Gonzalez-Rivas v. Garland*, 109 F.4th 1010, 1012 (8th Cir. 2024) (noting "we find no error or abuse of discretion" without determining which standard of review applies).

U.S.C. § 1229b, which governs cancellation of removal."[14] Second, the INA "restores judicial review for only a subset of claims—'constitutional claims or questions of law.'"[15]

Several years ago, the Supreme Court decided *Guerrero-Lasprilla v. Barr.*[16] There, it held that the phrase "questions of law" in 8 U.S.C. § 1252(a)(2)(D) extends to mixed questions of law and fact.[17] Pursuant to *Guerrero-Lasprilla*, the Court determined in the underlying appeal here that "the application of the statutory 'exceptional and extremely unusual hardship' standard to a given set of facts presents a mixed question of law and fact" and therefore is reviewable.[18] As the Court explained:

> [A] court is still without jurisdiction to review a factual question raised in an application for discretionary relief . . . . [T]hat would include the IJ's underlying factual determination that Wilkinson was credible, or the finding that M. had a serious medical condition. When an IJ weighs those found facts and applies the "exceptional and extremely unusual hardship" standard, however, the result is a mixed question

---

[14] *Wilkinson*, 601 U.S. at 226 (Jackson, J., concurring in the judgment).
[15] *Id.* (quoting 8 U.S.C. § 1252(a)(2)(D)).
[16] 589 U.S. 221 (2020).
[17] *Id.* at 225.
[18] *Wilkinson*, 601 U.S. at 221.

of law and fact that is reviewable under § 1252(a)(2)(D).[19]

In other words, we only have jurisdiction because this mixed question encompasses a legal inquiry: what the words in the statute mean and how they apply. As we are prohibited from reviewing the underlying factual findings, one might think we would separate out the purely legal components and review them *de novo*. However, that cannot be correct. The Supreme Court instructed that our review must be deferential because the question is overwhelmingly factual. That is true even though factual findings remain strictly unreviewable.

To sort through this conundrum, we turn to the roadmap laid out in *U.S. Bank National Association v. Village at Lakeridge, LLC*.[20] There, the Supreme Court confronted a "mixed" question that, like the question before us, required determining "whether the historical facts found satisfy the legal test chosen."[21] In such cases, courts must ask "[w]hat is the nature of the mixed question here and which kind of court . . . is better suited to resolve it?"[22] Where mixed questions "immerse courts in case-specific factual issues," as in *U.S. Bank*, "appellate courts should usually review a decision with deference."[23] To select from among the possible deferential standards, the Court in *U.S. Bank* imported the same standard that there governed review of the factual findings

---

[19] *Id.* at 222.
[20] 583 U.S. 387 (2018).
[21] *Id.* at 394.
[22] *Id.* at 395.
[23] *Id.* at 396.

11

themselves—clear error.[24]  The Supreme Court followed the same approach two years later in *Monasky v. Taglieri*, concluding that clear-error review governed the mixed—but primarily factual—determination of a person's habitual residence.[25]  The Court explained that when a court of appeals reviews a trial court's determinations, "[g]enerally, questions of law are reviewed *de novo* and questions of fact, for clear error, while the appropriate standard of appellate review for a mixed question 'depends . . . on whether answering it entails primarily legal or factual work.'"[26]

Here, there is no doubt that the factfinder is best suited to evaluate the purely factual question of actual hardship.  The factfinder also is best suited to evaluate the "primarily factual" question of whether that hardship is severe enough to be described as exceptional and extremely unusual, as the statute requires.[27]  Accordingly, the analysis in *U.S. Bank* convinces us that the deference afforded the agency's factual findings should also govern this mixed inquiry.  While we cannot review factual findings in cancellation-of-removal proceedings, the INA instructs courts, in addressing other types of immigration relief, to review agency factfinding for substantial evidence.[28]  Substantial evidence also is the

---

[24] *Id.* at 399.
[25] 589 U.S. 68, 83–84 (2020).
[26] *Id.* (quoting *U.S. Bank*, 583 U.S. at 396).
[27] *Wilkinson*, 601 U.S. at 225.
[28] *See* 8 U.S.C. § 1252(b)(4)(B) (providing that agency "findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary");

standard that the Administrative Procedure Act prescribes generally for agency factfinding in formal, on-the-record hearings.[29]

**1.**

By contrast, we disagree with Wilkinson's assertion that we review for an abuse of discretion. As Wilkinson notes, that standard is "essentially the same" as arbitrary-and-capricious review.[30] These are not typically the standards for reviewing factual findings.[31] Accordingly, they are not consistent with

---

*Nasrallah v. Barr*, 590 U.S. 573, 584 (2020) (noting that 8 U.S.C. § 1252(b)(4)(B) refers to the substantial-evidence standard). Wilkinson's contention that the INA "limits" the substantial-evidence standard "to 'findings of fact'" lacks textual support. Pet'r Suppl. Br. 15. The statute does not say this standard is so limited. But even if this were accurate, it would not matter because under *U.S. Bank*, we identify a standard for the mixed question by drawing from the standard applicable to factual findings. *See U.S. Bank*, 583 U.S. at 399.

[29] 5 U.S.C. § 706(2)(E).

[30] Pet'r Suppl. Br. 14.

[31] *See Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 559, 563 (2014) ("Traditionally, decisions [by a district court] on 'questions of law' are 'reviewable *de novo*,' decisions on 'questions of fact' are 'reviewable for clear error,' and decisions on 'matters of discretion' are 'reviewable for abuse of discretion.'") (quoting *Pierce v. Underwood*, 487 U.S. 552, 558 (1988)); *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992) ("A court reviewing an agency's adjudicative action should accept the *agency's* factual findings if those findings are supported by substantial evidence on the record as a

13

the analysis in *U.S. Bank*. Instead, abuse-of-discretion and arbitrary-and-capricious review train our focus on the decisionmaker's process in arriving at a particular outcome, asking whether she considered the appropriate factors and properly justified her decision.[32] These standards are a good fit "where a decisionmaker has 'a wide range of choice as to what [s/]he decides,'" as well as where the factfinder's decision "is given 'an unusual amount of insulation from appellate revision' for functional reasons."[33] Accordingly, it is appropriate to apply abuse-of-discretion review to mixed questions that involve litigation-management considerations such as whether to award attorney fees,[34] enforce a subpoena,[35]

---

whole."); 5 U.S.C. § 706(2)(E) (providing for substantial-evidence review of agency findings made in on-the-record hearings).

[32] *See United States v. Taylor*, 487 U.S. 326, 336 (1988) (explaining that the abuse-of-discretion standard requires a district court to "carefully consider those factors" that Congress has declared govern a decision "and, whatever its decision, clearly articulate their effect"); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (explaining that the arbitrary-and-capricious standard means "the agency must examine the relevant data and articulate a satisfactory explanation for its action").

[33] *McLane Co. v. EEOC*, 581 U.S. 72, 83 (2017) (quoting Maurice Rosenberg, *Judicial Discretion of the Trial Court, Viewed From Above*, 22 Syracuse L. Rev. 635, 637 (1971)).

[34] *See Highmark Inc.*, 572 U.S. at 563–64; *Pierce*, 487 U.S. at 558–63.

[35] *See McLane Co.*, 581 U.S. at 79–82.

or impose Rule 11 sanctions,[36] as Wilkinson argues. Such determinations require a court to weigh the equities and make judgment calls in addition to involving careful consideration of the facts.[37]

The statutory hardship determination before us is not such a question. Deference is appropriate here because the IJ actually heard testimony and had to assess credibility. The appeal turns on our application of a legal principle as set forth in a statute. It does not involve case management or judgment calls.

Wilkinson cites historical practice as a reason to review for abuse of discretion. It is true that courts historically applied this standard under a materially different version of the INA. Before 1996, the hardship component of this immigration relief fell entirely to the agency's discretion[38] and courts reviewed

---

[36] *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 399–405 (1990).

[37] *See id.* at 404 (explaining that a district judge must determine "when a sanction is warranted to serve Rule 11's goal of specific and general deterrence"); *McLane Co.*, 581 U.S. at 81 (noting that "whether a subpoena is overly burdensome" is a "fact-intensive, close call[]") (quoting *Cooter & Gell*, 496 U.S. at 404); *Highmark Inc.*, 572 U.S. at 564 (explaining that the attorney-fee determination draws on the district court's experience of having "live[d] with the case over a prolonged period of time").

[38] *See* 8 U.S.C. § 1254(a)(1) (1995) (amended 1996) (providing for suspension of deportation where, among other

15

hardship determinations for abuse of discretion.[39]  This changed when Congress rewrote the cancellation-of-removal provision, eliminating the instruction that hardship be determined "in the opinion of the attorney general."[40]  As the Supreme Court made crystal-clear in remanding this case, given that legislative amendment, hardship determinations were no longer discretionary.[41]  That counsels against adopting the abuse-of-discretion standard.  Accordingly, determinations made before 1996 do not advance our inquiry.

Wilkinson interprets this statutory history to mean that Congress, by making the hardship determination non-discretionary, intended us to afford the agency less deference. But this history cuts both ways.  The 1996 amendments created a two-step inquiry, whereby the IJ first determines whether the applicant satisfies the statutory criteria, including hardship,[42] and second, decides whether to exercise its discretion to include the applicant among the 4,000 individuals who may

---

requirements, "in the opinion of the Attorney General," deportation would "result in extreme hardship to the alien or to his spouse, parent, or child" lawfully residing in the United States).

[39] *See Amezquita-Soto v. INS*, 708 F.2d 898, 902–03 (3d Cir. 1983); *Bueno-Carrillo v. Landon*, 682 F.2d 143, 145–47 (7th Cir. 1982).

[40] *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, § 240A(b)(1)(D), 110 Stat. 3009-546, 594 (codified at 8 U.S.C. § 1229b).

[41] *Wilkinson*, 601 U.S. at 224.

[42] U.S.C. §§ 1229b(1)(A)–(D).

receive relief in any year.[43]  Whereas these changes rendered the hardship determination non-discretionary at the first step, they added agency discretion at the second step.[44]  Moreover, the underlying factual findings became entirely unreviewable with the addition of the jurisdiction-stripping provision codified at 8 U.S.C. § 1252(a)(2)(B)(i).[45]  If anything, those revisions collectively suggest that Congress envisioned a "minimal" supervisory role for courts.[46]  At bottom, as in *Monasky v. Taglieri*, historical practice has no role to play here because "there has been no uniform, reasoned practice"[47] sufficient to establish "a historical tradition,"[48] and "[m]oreover, when a mixed question has a factual foundation as evident as the . . . inquiry here does, there is scant cause to default to historical practice."[49]

We therefore hold that the substantial-evidence standard governs review of a hardship determination in a cancellation-of-removal proceeding.

---

[43] 8 U.S.C. § 1229b(e).

[44] *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996 § 240A(e).

[45] *See id.* § 242(2)(B).

[46] *See Wilkinson*, 601 U.S. at 226 (Jackson, J., concurring in the judgment) (discussing statutory history and opining, "Congress made clear that courts should play a minimal role in the discretionary-relief process").

[47] 589 U.S. at 84.

[48] *Id.* (quoting *Pierce*, 487 U.S. at 558).

[49] *Id.*

## B. Exceptional and Extremely Unusual Hardship

Having identified the applicable standard, we must now assess whether substantial evidence supports the IJ's hardship determination. In doing so we will uphold the IJ's determination "unless any reasonable adjudicator would be compelled to conclude to the contrary."[50]

### 1.

The phrase "exceptional and extremely unusual hardship" in 8 U.S.C. § 1229b(b)(1)(D) has long been understood to require a showing "substantially beyond the ordinary hardship that would be expected when a close family member leaves this country."[51] While this does not mean that the consequences of deportation must be "unconscionable,"[52] it does limit relief to "truly exceptional" situations.[53] This makes sense. Whereas the pre-1996 version of the statute permitted relief if removal simply "result[ed] in extreme hardship,"[54] Congress added qualifying language to require that the hardship be more than "extreme." It required instead

---

[50] *Nasrallah*, 590 U.S. at 584 (quoting 8 U.S.C. § 1252(b)(4)(B)).

[51] *In re Monreal-Aguinaga*, 23 I&N Dec. 56, 62 (BIA 2001) (internal quotation marks omitted); *see also Pareja v. Att'y Gen.*, 615 F.3d 180, 193–95 (3d Cir. 2010) (upholding the interpretation of § 1229b(b)(1)(D) set forth in *In re Monreal-Aguinaga*).

[52] *In re Monreal-Aguinaga*, 23 I&N Dec. at 61.

[53] *Id.* at 62 (quoting H.R. Conf. Rep. No. 104–828, at 213–14 (1996)).

[54] 8 U.S.C. § 1254(a)(1) (1995) (amended 1996).

that it be "exceptional and extremely unusual."[55]   This plainly raises the bar and permits relief only where the hardship goes beyond that which is inherent in forced deportation.

In evaluating the degree of hardship, courts and the agency consider the "ages, health, and circumstances" of qualifying relatives.[56]  The focus is on hardship to the relative, not to the petitioner.[57]  The BIA has stated that an applicant with "a qualifying child with very serious health issues, or compelling special needs in school" could have a strong case, while "[a] lower standard of living or adverse country conditions in the country of return . . . generally will be insufficient in themselves to support a finding of exceptional and extremely unusual hardship."[58]

**2.**

The IJ's analysis correctly focused on how Wilkinson's deportation would impact M., Wilkinson's qualifying U.S.-citizen relative.  The IJ noted that M. has eczema, as well as asthma, a serious medical condition.  While acknowledging that Wilkinson plays an important role in M.'s life and that his incarceration has caused M. to struggle, the IJ viewed the history of father and son living separately as evidence that M. can live without Wilkinson's daily presence.  The IJ explained that Watson has been M.'s primary caretaker for years and that, while "it will be difficult to balance work and being a mother" if Wilkinson is removed, Watson will have the continuing

---

[55] 8 U.S.C. § 1229b(b)(1)(D).
[56] *In re Monreal-Aguinaga*, 23 I&N Dec. at 63.
[57] *Id.* at 58.
[58] *Id.* at 63–64.

support of her own mother, Tracy Collins.[59]    While Wilkinson's removal likely would diminish his financial support to the family, the IJ noted that Wilkinson could continue to send money if he finds a job in Trinidad and Tobago and that M. would continue to receive medical insurance from the state.  The IJ also found that Watson will be "able to work."[60]  Accordingly, the IJ ultimately concluded that neither the loss of Wilkinson's income nor the loss of his fatherly presence would cause hardship "beyond that which would normally be expected from the removal of a parent and provider."[61]

We are sympathetic to the plight of Wilkinson and M., as well as to the hardship that Wilkinson's removal will cause M.  However, given our limited and deferential standard of review, we must agree that substantial evidence supports the IJ's conclusion that Wilkinson's removal will not result in the exceptional and extremely unusual hardship required for the relief Wilkinson seeks.  M.'s distress in response to his father's detention is, indeed, heart wrenching.  But "struggling," "feeling sad," and "acting up,"[62] are exactly the responses we would expect when a beloved parent faces deportation.  We do not mean to minimize the severity of M.'s pain, for we have no doubt that his father's situation impacts him severely.  But we cannot characterize it as "extremely unusual."

---

[59] AR 59.
[60] AR 59.
[61] AR 60.
[62] AR 59.

Wilkinson argues that the testimony about M.'s behavioral and emotional problems is sufficient because in other unpublished decisions, the BIA has found the standard satisfied by U.S.-citizen children experiencing documented mental-health issues.[63] These cases are distinguishable, though, because they rely upon either testimony of a mental-health provider or diagnosis of a mental-health condition to establish both the severity of the condition and its nexus to the parent's removal. This distinction matters. It is possible that some of M.'s behavior—such as "breaking things"[64]—signals an exceptional psychological vulnerability that may rise to the level of the required "exceptional and extremely unusual" hardship. However, absent the kind of testimony from a mental-health provider or a diagnosis of a mental-health condition that was put on the record in the cases cited by Wilkinson,[65] this record simply does not support a finding that M.'s problems qualify for relief under 8 U.S.C. § 1229b.

---

[63] *See* Pet'r Suppl. Br. Addendum (submitting seven unpublished BIA decisions).

[64] AR 59.

[65] *See In re L-A-B-C-*, No. A208-442-797, at 1–2 (BIA Jan. 19, 2018) (10-year-old son "diagnosed with adjustment disorder with mixed anxiety and depression," requiring therapy and Zoloft, as well as asthma, would suffer mental-health consequences if father were removed); *In re R-M-M-M-*, No. AXXX-XXX-256, at 1 (BIA May 12, 2016) (son was diagnosed with ADD, needed an Individualized Education Plan at school, and had become "visibly shaken" under questioning about his father's immigration situation); *In re J-A-M-A-*, No. AXXX-XXX-716, at 2 (BIA May 18, 2021)

Wilkinson protests that he cannot produce such evidence because Watson "refused to allow" M. to obtain "even an initial appointment to be diagnosed."[66] When asked about the possibility of sending M. to counseling, Watson testified that she "didn't think that that was a good idea"[67] and was choosing instead to "guide" and "support" her son herself.[68] Watson is M.'s custodial parent. We are in no position to second-guess Watson's decision about what is best

(licensed therapist submitted report that daughter suffered from anxiety disorder "resulting in maladaptive behaviors directly caused by separation from her father"); *In re J-V-P-A-*, No. AXXX-XXX-460, at 2 (BIA Jan. 30, 2017) (therapist testified that daughter "was having daily panic attacks" and that "already fragile emotional state would be adversely impacted" by father's removal); *In re R-L-R-L-*, No. AXXX-XXX-540, at 2 (BIA Nov. 2, 2018) (clinical psychologist opined about son's "antisocial behaviors," which "severe stressors" could exacerbate to the point of "significant mental deterioration"); *In re A-R-R-*, No. AXXX-XXX-004, at 1–2 (BIA Feb. 26, 2018) (in a "close case," daughter "seeking therapy for depression and/or anxiety that stems, in large part, from her father's immigration situation" was a contributing factor in establishing hardship); *In re J-M-C-S-*, No. AXXX-XXX-184, at 1 (BIA June 29, 2015) (step-son received "therapy and medication for his psychiatric conditions" and record included "professional opinions that the child's psychiatric conditions could regress and worsen without the respondent's presence").

[66] Pet'r Jan. 16, 2025 Ltr. to P. Dodszuweit at 1.
[67] AR 248:24.
[68] AR 249:13–14.

for her child.  However, the absence of evidence from an appropriately credentialed professional results in a record that is simply not sufficient to support Wilkinson's claim for relief here.  We do not foreclose the possibility that future litigants could establish the requisite hardship through other forms of proof.  However, the lay testimony from Wilkinson, Watson, and Collins does not provide a sufficient evidentiary basis for concluding that M.'s problems go "substantially beyond the ordinary hardship that would be expected when a close family member leaves this country."[69]

We also agree that the financial consequences of Wilkinson's removal, while profound, are not exceptional. Deporting a breadwinner inevitably hurts a family financially. But the IJ's factual findings support the conclusion that these consequences can be mitigated, particularly since Watson is capable of finding work.  M. will not lose his health insurance, and Wilkinson could continue to send money from Trinidad and Tobago after removal.

Wilkinson asks us to overlook the IJ's finding that Watson is "able to work,"[70] asserting that she suffers from debilitating depression that prevents her from becoming a provider.  Without more, we cannot depart from the IJ's assessment that Watson's ability to work mitigates the financial consequences for M. of Wilkinson's removal. Moreover, Wilkinson's characterization is not supported by the

---

[69] *In re Monreal-Aguinaga*, 23 I&N Dec. at 62 (internal quotation marks omitted).
[70] AR 59.

record.[71]  Similarly, Wilkinson's suggestion that mental-health challenges prevent Watson from caring for M. is inconsistent with the IJ's findings that she "is his primary caretaker and has been for the past five years."[72]  That finding is consistent with the record.  We are not persuaded that Watson's choice to occasionally leave M. in his grandmother's care means she is "unable to care for him."[73]

Nor are Wilkinson's remaining arguments persuasive.  While the IJ found that M. had a serious medical condition, the record does not establish a connection between Wilkinson's presence in the United States and the management of that condition.[74]  Wilkinson's departure will not impact M.'s

---

[71] Watson's credited testimony was that if Wilkinson were removed, she "would have to find a job," AR 253:25, despite not having done so "in a couple of years," AR 253:24, because she was "comfortable with [Wilkinson] taking care of [her]," AR 254:6–7.  She referred to her intention to "provide" for M. should Wilkinson be removed, AR 252:22, and her belief that M. would be better off with her in New Jersey than in Trinidad and Tobago, AR 252:20–23.  She also revealed that while not formally employed, she "do[es] hair under the table" and "make[s] a lot of money doing hair."  AR 274:7.

[72] AR 59.

[73] Pet'r Suppl. Reply 1.

[74] *See, e.g.*, *Matter of J-J-G-*, 27 I&N Dec. 808, 812 (BIA 2020) (finding daughter's medical condition did not establish exceptional and extremely unusual hardship because she would continue to receive treatment in the United States if her father were removed).  The out-of-circuit case that Wilkinson sites,

medical insurance or his access to care, and Watson's testimony suggests she is experienced at managing M.'s medical conditions. The IJ also adequately aggregated sources of hardship. We agree with Wilkinson that the IJ's statement that the case "boils down to" the loss of Wilkinson's financial support is troubling.[75] It greatly and unjustifiably minimizes and devalues the impact Wilkinson's removal will have on his child. However, when that sentence is read in context, it is clear that the IJ considered the totality of the circumstances and did not focus on any one factor in denying Wilkinson's claim for relief.

Finally, we note that Wilkinson submitted two supplemental authorities after argument.[76] However, neither is binding nor sufficiently analogous to be persuasive. *Lopez-Portillo v. Attorney General* turned on critical factual findings that are absent here, including that the children would be left in the care of a remaining parent with whom they lacked a common language, that the father's detention directly exacerbated a child's medical condition, and that the father's

---

*Mendez v. Holder*, is distinguishable because it involved a child who would be removed with his father to another country, where the condition could not be adequately managed. 566 F.3d 316, 318–19 (2d Cir. 2009) (per curiam). Here, again, M. will remain in the United States in Watson's care, where his medical insurance is covered by the state.

[75] AR 60.

[76] After this case was argued, Wilkinson's counsel submitted two letters pursuant to Rule 28(j) of the Federal Rules of Appellate Procedure. *See* Pet'r Dec. 31, 2024 Ltr. to P. Dodszuweit; Pet'r Jan. 16, 2025 Ltr. to P. Dodszuweit.

removal would drive the family below the poverty line.[77] *Calderon-Escobar v. Attorney General* involved a child who was diagnosed with a range of psychological conditions requiring follow-up treatment in a hospital, and for which adequate care was not available in Mexico, the country to which the father would have been removed.[78] As we have already noted, this record lacks that kind of professional or medical evidence. Further, M. would remain in the United States, so the availability of care in the country to which the parent would be deported is not material. Neither case changes the outcome here.

## CONCLUSION

Because substantial evidence supports the conclusion that Wilkinson has not satisfied the hardship requirement to qualify for cancellation of removal, we will deny the petition for review.

---

[77] No. 24-10647, 2024 WL 5220909, at *1, *4 (11th Cir. Dec. 26, 2024) (per curiam).
[78] No. 23-2164, 2025 WL 66347, at *2 (3d Cir. Jan. 10, 2025).