# United States Court of Appeals
## For the First Circuit

No. 24-1432

MIGUEL ARMANDO RIVERA SAMAYOA,

Petitioner,

v.

PAMELA J. BONDI, Attorney General of the United States,[*]

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Gelpí, Lipez, and Thompson,
<u>Circuit Judges</u>.

<u>Kristian R. Meyer</u>, with whom <u>Kevin P. MacMurray, Esq.</u>, and <u>MacMurray & Associates</u>, were on brief, for petitioner.

<u>Sharon M. Clay</u>, Trial Attorney, Office of Immigration Litigation, Civil Division, with whom <u>Brian Boynton</u>, Principal Deputy Assistant Attorney General, Civil Division, and <u>Paul Fiorino</u>, Senior Litigation Counsel, Civil Division, were on brief, for respondent.

July 28, 2025

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Pamela J. Bondi is automatically substituted for former Attorney General Merrick B. Garland as respondent.

**THOMPSON, Circuit Judge.** In this immigration appeal, Miguel Armando Rivera Samayoa ("Rivera") petitions for review of the Board of Immigration Appeals' ("BIA") denial of his application for cancellation of removal under section 240A(b) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1229b(b). Rivera alleges that the BIA erred in affirming the Immigration Judge's ("IJ" and, collectively with the BIA, "the Agency") determination that Rivera's United States citizen children would not suffer "exceptional and extremely unusual hardship" upon his removal from the country. See 8 U.S.C. § 1229b(b)(1). For the reasons stated below, we must deny the petition.

### I. BACKGROUND

Before addressing the merits of Rivera's petition, we first introduce the reader to Rivera and his family, pulling our background "from the administrative record, including [Rivera's] testimony before the IJ, which [the IJ] found credible." Rodrigues v. Garland, 124 F.4th 58, 62 (1st Cir. 2024) (quoting Gonzalez-Arevalo v. Garland, 112 F.4th 1, 6 (1st Cir. 2024)).

Rivera, a native and citizen of Guatemala, entered the United States on October 3, 1996. Shortly after entering the country, Rivera did a brief stint in California before moving to Massachusetts, where he has lived ever since. During his time in Massachusetts, Rivera has fathered four United States citizen children. Rivera's first of his four sons, Adrian, was born in

- 2 -

Massachusetts to Aravila Pena in December 1998. At some point, Adrian was diagnosed with "the beginnings of asthma" but has since become a healthy young man with no significant health issues. At some unknown time (the record is silent), Adrian and his mother moved to New Jersey where they currently reside. Rivera says that he continues to provide "economically" for his eldest son and stays in regular contact with him over the phone.

Rivera and his current partner, Nancy Mehla, have three sons together -- Miguel, A., and D. -- all born in Massachusetts. Miguel, born in April 2005, contracted lead poisoning at an early age. As a result, he experiences aches and pains and requires extra help in school. For these health care issues, Miguel receives treatment covered by insurance through MassHealth,[1] and has become medically stable. Rivera's third son, A., born in April 2012, suffered health complications when he was a toddler due to some type of improper blood flow. Early on, A. was diagnosed with anemia which has since been addressed through a healthy diet. Despite lingering pain and migraines, A. has been stable for four years. Lastly, the youngest of the bunch, D., was born in August 2015. D. has also been diagnosed with anemia and previously

---

[1] MassHealth is a combination of Medicaid and the Children's Health Insurance Program that provides health benefits to qualifying children, families, seniors, and people with disabilities living in the Commonwealth of Massachusetts. See MassHealth, https://perma.cc/DW84-V65Y (last visited May 27, 2025).

suffered from serious nose bleeds which required hospitalization on one occasion, but this also seems to have gotten under control.

## A. Legal Primer

Due to the "quirkiness of immigration law" in the United States, before getting into what the IJ and the BIA had to say in Rivera's case, it will be helpful to provide a brief primer on the relevant legal principles and general statutory scheme for context. Cf. Adeyanju v. Garland, 27 F.4th 25, 33 (1st Cir. 2022) (pausing to explain the intricacies of immigration procedure and review).

If a noncitizen present here is found to have violated our immigration laws, an IJ may hold a hearing and find that individual removable from the country. But this finding does not necessarily end the immigration process for that individual. Congress has created several avenues of discretionary relief for removable noncitizens which allow such persons to remain legally in the United States, including what's referred to as a "cancellation of removal" under the INA, 8 U.S.C. § 1229b(b). Under this provision, a noncitizen bears the burden of proving that he or she not only "satisfies the applicable [statutorily prescribed] eligibility requirements," but also "merits a favorable exercise of discretion." 8 U.S.C. § 1229a(c)(4)(A). If a noncitizen's application accomplishes these two criteria (the statutory requirements and favorable exercise of discretion), the

noncitizen may garner permission to remain in the country lawfully. See generally Wilkinson v. Garland, 601 U.S. 209, 212-13 (2024).

The statutory requirements for cancellation-of-removal eligibility are: (1) continuous physical presence in the United States for more than ten years; (2) "good moral character" during that period; (3) no convictions of certain enumerated criminal offenses; and (4) evidence establishing that removal would result in "exceptional and extremely unusual hardship" to the noncitizen's spouse, parent, or child who is a citizen of the United States. 8 U.S.C. § 1229b(b)(1). As we will soon explain, since the IJ decided in Rivera's favor for the first three elements, Rivera's petition today focuses on the Agency's adverse finding regarding the fourth element, exceptional and extremely unusual hardship to a qualifying relative.

With these principles in mind, we turn to the Agency's decision.

### B. Procedural History

Rivera lived in this country for more than twenty years before he was served with a Notice to Appear charging him with removability pursuant to section 212(a)(6)(A)(i) of the INA, 8 U.S.C. § 1182(a)(6)(A)(i) (current version at 8 U.S.C. § 1227(a)(1)(B)). Rivera conceded the charge of removability, but seeking to remain in the country lawfully, applied for cancellation

- 5 -

of removal under the INA.[2]  On June 12, 2019, Rivera appeared at a hearing before an IJ where he testified in support of his application.

Following the hearing, the presiding IJ issued an oral decision wherein he made three findings as to Rivera's eligibility for cancellation: the ages of Rivera's children sufficiently evidenced the continuous physical presence requirement; Rivera satisfied the good moral character requirement; and he had no record of any enumerated criminal offenses.  From there, the IJ quickly proceeded to the thornier prong four question of exceptional and extremely unusual hardship to Rivera's qualifying relatives.

The IJ's analysis began with a finding that Rivera has four Spanish-speaking, United States citizen children (whom we've already introduced above).  The IJ then entered findings related to the children's various health conditions and discussed the hardship they would face should their father be removed.  The IJ added that Rivera supports and cares for his children, and that Rivera believes they would not survive or succeed without him in the United States.  The IJ also noted Rivera's fears about relocating his family to Guatemala, where they could all be exposed to gangs and experience a reduction in the quality of their lives.

_____

[2] Rivera initially filed an asylum application as well; however, he withdrew this application with prejudice.

Weighing these findings, the IJ denied Rivera's application for cancellation of removal because Rivera had not demonstrated that his removal would result in exceptional and extremely unusual hardship to his sons. Specifically, after considering the ages, health status, family relationships, and the economic and political conditions of Guatemala, and making mention of "the children's comfort and familiarity with the language and way of life in the country of removal," the IJ concluded the hardship suffered by Rivera's sons was "not substantially beyond the ordinary hardship that would be expected when a close family member leaves the country." Furthermore, the IJ briefly discussed the possibility of voluntary departure for Rivera to open the door for later lawful reentry into the country through the sponsorship of his eldest son.[3] However, the IJ made clear that the possibility of future lawful reentry did not factor into the hardship determination, concluding, "[i]n any event, even without the sponsorship of the son," Rivera did not establish his removal would cause the requisite hardship to his sons.

Rivera appealed the IJ's decision to the BIA and, on appeal, the BIA adopted and affirmed the IJ's decision. In its opinion, the BIA reinforced the IJ's analysis of the cumulative factors underlying the hardship determination with citations to

---

[3] Rivera had requested voluntary departure and the IJ granted it.

its own precedent. Responding to Rivera's particular emphasis on the medical conditions of his children, and because Rivera did not say whether his children would accompany him to Guatemala should he be ordered to leave the country, the BIA noted that the record did not establish "that [Rivera's sons would] be unable to continue to receive necessary medical treatment" whether they stayed in the United States or left with Rivera.

Still seeking to remain in the country lawfully, Rivera petitioned this court for review seeking a reversal of the BIA's decision.

## II. DISCUSSION

Rivera presents several arguments in his petition for review, but, as the reader will soon learn, our court's limited jurisdiction prohibits us from addressing them all. So first, we will provide a quick rundown of the arguments advanced, followed by an explanation of what we can actually tackle and how we will go about doing so.

Before we delve into the details of Rivera's petition, we note that when, as here, the "BIA adopts the IJ's decision but adds its own gloss, we 'review the decisions of both the BIA and the IJ' together." Figueroa, 119 F.4th at 166 (quoting Espinoza-Ochoa v. Garland, 89 F.4th 222, 230 (1st Cir. 2023)).

Primarily, Rivera argues the record evidence compelled a finding that the cumulative impact of Rivera's departure from

- 8 -

the United States would result in exceptional and extremely unusual hardship to his sons -- thereby satisfying this statutory requirement for cancellation of removal. While presenting this broader claim, Rivera also argues that the BIA legally erred by failing to correct three erroneous factual findings made by the IJ which were not supported by the record: (1) Rivera's children were comfortable with the Spanish language and the way of life in Guatemala; (2) Rivera's sons were healthy and medically stable; and (3) Rivera's eldest son could aid in his lawful reentry. Separately, Rivera argues both the IJ and BIA legally erred by failing to consider how Rivera's removal would impede his sons' ability to receive medical treatment and continue their educations.

Not all of Rivera's claims are alike, and the differences between them impact the work we can do and how we can do it. Therefore, we next clarify our jurisdiction and the appropriate standard of review (where applicable) for each argument before considering the merits.

### A. Jurisdiction and Standard of Review

Our jurisdiction to review Rivera's petition comes from 8 U.S.C. § 1252(a)(2)(D). See Wilkinson, 601 U.S. at 217. Yet our review remains limited under the jurisdiction-stripping scheme designed by Congress for certain immigration cases like this one. See id. at 218. This scheme bars us from reviewing the facts

underlying the Agency's determination, but we retain jurisdiction to review questions of law, including the application of a legal standard to a given set of adjudicated facts. See Figueroa, 119 F.4th at 165 (first citing Wilkinson, 601 U.S. at 212-16; then Guerrero-Lasprilla v. Barr, 589 U.S. 221, 231-33 (2020); and then Patel v. Garland, 596 U.S. 328, 339 (2022)); see also Contreras v. Bondi, 134 F.4th 12, 19 (1st Cir. 2025) (discussing jurisdiction to review mixed questions of law and fact). All of Rivera's arguments fall within one of these three buckets -- questions of fact, questions of law, and mixed questions of law and fact -- and each argument's classification controls our jurisdiction and the applicable standard of review.

The exceptional and extremely unusual hardship determination is one example of the application of a legal standard to a set of facts and is reviewable as a mixed question of law and fact. Wilkinson, 601 U.S. at 217; Contreras, 134 F.4th at 19. Therefore, we have jurisdiction to review Rivera's primary challenge -- that the cumulative impact of his removal will cause exceptional and extremely unusual hardship to his sons. Our review of this hardship determination is deferential. Figueroa, 119 F.4th at 166 (citing Wilkinson, 601 U.S. at 225).[4]

---

[4] While different deferential standards of review exist out there, the First Circuit has yet to favor a particular one. Our sister circuits have generally left the question of a precise standard of deference for another day. See Cortes v. Garland, 105

Rivera's contentions with certain factual findings from the IJ -- which he believes the BIA erroneously accepted -- require a different approach. To reiterate, these findings contributed to the Agency's ultimate hardship determination and include findings that Rivera's sons' ability to speak Spanish and their familiarity with the culture would make them comfortable in Guatemala and that Rivera's sons were essentially healthy and medically stable. In our review of Rivera's petition, we are "without jurisdiction to review a factual question raised in an application for discretionary relief." Wilkinson, 601 U.S. at 222; see also Figueroa, 119 F.4th at 165. Therefore, we may not consider these claims. See Wilkinson, 601 U.S. at 225 (explaining that "the seriousness of a family member's medical condition . . . remain[s] unreviewable"); Nolasco v. Bondi, 134 F.4th 677, 686 (1st Cir. 2025).[5]

---

F.4th 124, 133-34 (4th Cir. 2024); Martinez v. Garland, 98 F.4th 1018, 1021 (10th Cir. 2024); Cruz-Martinez v. Garland, No. 23-3394, 2024 WL 4879468, *1-2 (9th Cir. Nov. 25, 2024); Cuenca-Arroyo v. Garland, 123 F.4th 781, 784 n.1 (5th Cir. 2024). But see Wilkinson v. Att'y Gen. U.S., 131 F.4th 134, 142 (3d Cir. 2025) (applying a substantial evidence standard of review). Insofar as Rivera's petition is concerned, we need not choose a specific standard of deference to resolve this case because we reach the same outcome regardless. Cf. Figueroa, 119 F.4th at 166 n.7 (citing Singh v. Rosen, 984 F.3d 1142, 1154 (6th Cir. 2021)).

[5] Both Rivera and the government categorize the IJ's finding that Rivera could possibly reenter the country lawfully with his eldest son's assistance as a factual finding, and as we just explained, we cannot review a factual finding. The government also brings to our attention that Rivera failed to make this

This leaves Rivera's alternative arguments that the Agency ignored crucial record facts evidencing the impact his removal would have on his sons' access to medical treatment and educational opportunities. Challenges of this ilk require yet another approach. An Agency decision that "'turn[s] a blind eye to salient facts' or 'completely overlook[s] critical evidence' is erroneous as a matter of law." Contreras, 134 F.4th at 20 (quoting Diaz-Valdez v. Garland, 122 F.4th 436, 446 (1st Cir. 2024)); see also Martinez v. Bondi, 132 F.4th 74, 79 (1st Cir. 2025) (finding a claim that the Agency failed to consider an applicant's individualized circumstances posed a reviewable question of law). Accordingly, this court has jurisdiction to review "questions of law," 8 U.S.C. § 1252(a)(2)(D) -- here whether Rivera is correct in his assertion that the Agency erred by ignoring "salient facts"

---

possible-reentry-based argument to the BIA, raising the question of exhaustion. Because the exhaustion point is dispositive, we bypass the jurisdictional question and decline to consider this aspect of Rivera's argument due to his failure to administratively exhaust it. See Odei v. Garland, 71 F.4th 75, 78 n.1 (1st Cir. 2023) (declining to review a claim not argued before the BIA); see also Tacuri-Tacuri v. Garland, 998 F.3d 466, 472 (1st Cir. 2021), abrogated on other grounds by Wilkinson, 601 U.S. 209 (bypassing an ambiguous jurisdictional question where precedent dictated a clear resolution to a claim). And for what it's worth, this particular finding has no bearing on Rivera's petition because the IJ did not rely on the possibility of lawful reentry in the cancellation of removal decision. See Cruz-Martinez, 2024 WL 4879468, at *2 & n.2.

or "critical evidence" -- and we review these questions de novo, see Adeyanju, 27 F.4th at 38; see also Contreras, 134 F.4th at 20.

Having whittled down the field of appellate claims that we have jurisdiction to consider, we proceed to our review.

## B. Consideration of Record Evidence

Among Rivera's reviewable claims, we start with his claims of legal error committed by the Agency when it failed, he says, to consider relevant record evidence in reaching its decision. And we start here because the evidence and reasoning from the Agency as discussed will help color Rivera's arguments regarding the hardship standard addressed later on. As we proceed to examine Rivera's first legal contention of error, an unfortunate but crucial, recurring theme throughout our analysis is this: Regrettably for Rivera, he simply did not provide enough evidence at his hearing to support the arguments he advances and, as we will explain, the Agency appropriately considered all the information it actually had before it.[6]

In framing and reviewing Rivera's arguments for legal error, an important piece of data remains unclear: Where will

---

[6] At oral argument, the parties alluded to hundreds of pages of evidence struck from the record by the IJ for untimeliness. Rivera does not challenge that exclusionary ruling, and we proceed with our review of the Agency's decision based on the facts it deemed it would consider. Further, the IJ found Rivera himself was responsible for the exclusion after failing to send the documents to his attorney on time.

Rivera's sons live if he is removed? The answer to this question shapes our discussion of Rivera's legal arguments (as well as our hardship analysis discussed later), so we lay a bit of foundation. Rivera recognizes in his brief "there was no definitive testimony or indication [below] that the children would not relocate." Indeed, Rivera never testified to where his children would go following his removal, and now on appeal presents a hodgepodge of arguments based on either hypothetical outcome.

After receiving Rivera's testimony, the IJ considered both landing spots for the children. Likewise, the BIA reviewed the IJ's decision with both potential relocation scenarios in mind, noting that Rivera did not indicate one way or the other. Without further evidence indicating where the children would live following Rivera's removal,[7] the Agency appropriately considered both relocation scenarios and did not err in making either assumption. See Domingo-Mendez v. Garland, 47 F.4th 51, 58 (1st Cir. 2022) (affirming the BIA's hardship determination where it considered the possibility of petitioner's children staying behind or joining their father in Guatemala); see also Manuel-Ramirez v.

---

[7] Rivera's claims ignore that "[i]t is the applicant's burden to establish that a qualifying relative will accompany him or her to the country of removal." Matter of J-J-G-, 27 I. & N. Dec. 808, 811 n.3 (BIA 2020) (citing 8 U.S.C. § 1229a(c)(4)(B)); see also Matter of Calderon-Hernandez, 25 I. & N. Dec. 885, 886 (BIA 2012) (discussing the presumptions and requirements of proof regarding whether a qualifying relative child will remain in the United States, or leave with the applicant).

- 14 -

Bondi, No.24-9526, 2025 WL 799481, at \*2, 5 (10th Cir. Mar. 13, 2025) (finding no error where the Agency considered the availability of medical treatment "in the United States or Mexico" where the applicant did not specify where their relative would go).  Like what the Agency did (and favorably to Rivera), we address Rivera's arguments under the premises set by Rivera -- that hardship would fall on his sons in either the United States or Guatemala following his removal -- and we ask for the gentle reader's patience while jumping between two different removal scripts.

Rivera argues both the IJ and the BIA erred as a matter of law by failing to consider the impact his removal would have on the availability of medical treatment for his sons' various ailments in either location.  Like some of Rivera's claims addressed above, the government would have us call this a factual finding by the Agency which we lack jurisdiction to review under Patel, 596 U.S. at 347, and Wilkinson, 601 U.S. at 222.  While we cannot disturb the findings of the Agency regarding the health status and required treatment of Rivera's sons (because these are factual findings), we can review the determination on the impact of removal -- as a legal question -- to ensure the Agency properly considered the relevant record evidence as required under the legal standard set forth in In re Monreal-Aguinaga, 23 I. & N. Dec. 56,

63 (BIA 2001), and Matter of J-J-G-, 27 I. & N. Dec. at 811. See Contreras, 134 F.4th at 20; Martinez, 132 F.4th at 79.

Starting with the proposition that Rivera's sons will relocate to Guatemala, the problem for Rivera is that the Agency considered all that he said about this topic, and the time to say more has passed. At the hearing, all Rivera told the IJ regarding medical treatment for his sons in Guatemala was "[i]n respect to medicine, everything is expensive over there" and "[i]f you don't have money, you can't survive." The record (consisting of only Rivera's testimony) lacks professional or medical evidence regarding the sons' conditions, and only covers some generalizations about the healthcare system in Guatemala rather than the ways that system might adversely impact the childrens' particular health concerns. Upon a review of the sparse evidence, the IJ found that Rivera's sons were essentially in relatively good health despite their previous ailments. Then, based on the IJ's findings, the BIA concluded that Rivera, upon whom the burden rested, "ha[d] not established that the children would be unable to receive adequate medical treatment in Guatemala." Rivera not only fell short of establishing that his sons had serious medical conditions, but also failed to provide evidence that they would be unable to receive adequate treatment in Guatemala. See Matter of J-J-G-, 27 I. & N. Dec. at 811 (placing the burden on an applicant to prove both a serious medical condition and the inaccessibility

- 16 -

of treatment).  Thus, upon review of the Agency's decisions, we cannot say the Agency turned a blind eye to the evidence available for its consideration, and therefore it did not commit legal error.

Rivera also argues the flip side of this, or as the government put it, he "hedged his bet."  Rivera reasons that if he is removed, his sons will no longer be able to "receive their necessary medical treatment" in the United States because he is the breadwinner of the family.  Looking to our established facts, there was nothing in the record for the Agency to consider regarding necessary medical treatment beyond potentially seeing a doctor when an issue arises and eating a healthy diet.  Also, the IJ found the sons in relatively good health at the time of the hearing, and we know that Rivera's son who had lead poisoning receives insurance through MassHealth.  Again, the Agency's decision shows that it considered the available evidence, and it did not err, as Rivera contends, by failing to consider the availability of necessary medical treatment for Rivera's sons should they remain in the United States without him.

Along the same lines, Rivera urges that the Agency failed to consider the consequences his removal would have on his sons' "educational opportunities and outcomes" should they relocate to Guatemala.  Based on Rivera's testimony, the IJ found that his son Miguel is in his "regular grade" at school, but learns slowly and sometimes requires additional help from teachers and his father.

The BIA also acknowledged Miguel's slower learning pace and noted that the childrens' ability to speak Spanish would "assist them in any educational pursuits." "When the BIA's decision is neither inconsistent with [the evidence at issue] nor gives reason to believe the BIA was unaware of it, we have no reason to doubt that the agency considered the evidence." Domingo-Mendez, 47 F.4th at 58 (quoting Lin v. Mukasey, 521 F.3d 22, 28 (1st Cir. 2008)). Both the IJ and BIA addressed Rivera's testimony related to his sons' education -- noting that Miguel requires additional help in school and Rivera supports his sons by helping them with homework -- "[s]o 'we see no reason to surmise that the [Agency] overlooked' the evidence in question." Id. (quoting Lin, 521 F.3d at 28).

In short, Rivera has not shown that the Agency committed legal error by overlooking or otherwise failing to consider relevant evidence.

### C. Exceptional and Extremely Unusual Hardship

Having dispatched Rivera's arguments of purely factual and purely legal error, we turn and confront head-on the mixed question of whether the record evidence compelled a finding that Rivera's removal would result in exceptional and extremely unusual hardship to his sons. As discussed previously, we have jurisdiction to review the hardship determination as a mixed question of law and fact and do so with deference to the Agency's decision. Wilkinson, 601 U.S. at 225.

- 18 -

In order to meet this standard, the applicant must demonstrate that the hardship to a qualifying relative will be "substantially beyond the ordinary hardship that would be expected when a close family member leaves this country." Figueroa, 119 F.4th at 166 (quoting In re Monreal-Aguinaga, 23 I. & N. Dec. at 62). It is a high burden intended to cover "truly exceptional situations." In re Monreal-Aguinaga, 23 I. & N. Dec. at 62 (citation modified). A noncitizen need not show that the hardship would be unconscionable, but the standard "constitutes a high threshold that is in keeping with Congress' intent to substantially narrow the class of aliens who would qualify for relief." Tacuri-Tacuri v. Garland, 998 F.3d 466, 472 (1st Cir. 2021) (quoting In re Gonzalez Recinas, 23 I. & N. Dec. 467, 470 (BIA 2002)), abrogated on other grounds by Wilkinson, 601 U.S. 209. Now that we're familiar with the hardship standard, we turn to Rivera's arguments based on the available record evidence which he believes warrants a different conclusion than the Agency reached.

To support his claim that the record compelled a finding of sufficient hardship to his sons, Rivera argues that the Agency did not assess the cumulative impact his removal would have on his children. It is true that in cancellation of removal cases, the Agency has a duty to "consider the ages, health, and circumstances of qualifying lawful permanent resident and United States citizen relatives." In re Monreal-Aguinaga, 23 I. & N. Dec. at 63. This

analysis requires an assessment of these factors "in their totality, often termed a 'cumulative' analysis." In re Gonzales Recinas, 23 I. & N. Dec. at 472.

After Rivera's hearing, the IJ stated, "to determine hardship, I have evaluated the ages, health, and circumstances of the qualifying family members, the respondent's family ties, the health of the respondent and his family members, the economic and political conditions in the country of return and significantly the possibility of other means of adjusting status." The IJ also summarized Rivera's testimony about his children and their health conditions, Rivera's fears that his children would not survive or succeed in the United States without him, and Rivera's concerns about going back to Guatemala. In adopting and affirming the IJ's decision, the BIA reiterated the list of factors considered by the IJ in the aggregate and confirmed that "the record does not establish that these hardships, considered cumulatively, will rise to the level of exceptional and extremely unusual hardship." In both decisions, the Agency demonstrated a familiarity with the entire record and stated unequivocally that it considered the required factors in its analyses. Plus, the Agency granted Rivera the benefit of reviewing two possible removal scenarios: one where his sons stay in the country and one where they return with him to Guatemala. Thus, we see no reason to believe the Agency failed to marshal and weigh the relevant hardship factors cumulatively. See

Manuel-Ramirez, 2025 WL 799481, at \*4 (finding the Agency properly considered the hardship factors in the aggregate when it said that it did and gave specific examples); see generally Dorce v. Garland, 50 F.4th 207, 212 (1st Cir. 2022) ("[T]he agency need only 'articulate its decision in terms adequate to allow a reviewing court to conclude that the agency has thought about the evidence and the issues and reached a reasoned conclusion.'" (quoting Raza v. Gonzales, 484 F.3d 125, 128 (1st Cir. 2007) (alteration omitted))).

Additionally, in his effort to prove hardship, Rivera cites various statistics about the economic and political conditions of Guatemala, including the lack of job opportunities, unavailability of healthcare in rural Guatemala, and insufficient labor regulations. Conditions in the country of removal may factor into the Agency's hardship determination, but they cannot satisfy the exceptional and extremely unusual hardship standard without additional evidence specific to an applicant's position. See Figueroa, 119 F.4th at 167 (citing In re Monreal-Aguinaga, 23 I. & N. Dec. at 63-64); see also In re Andazola, 23 I. & N. Dec. 319, 323 (BIA 2002).

Rivera's argument boils down to his belief that should he be deported, the high unemployment and the lack of opportunity in Guatemala will reduce his family's quality of life and potentially limit his children's ability to receive medical care

"whether they are forced to relocate to Guatemala or remain in the United States." More to this point, Rivera emphasizes that what his partner makes "weekly will not be enough" to support their family as an accident to her leg limits her ability to work. In light of the limited evidence Rivera provided in his testimony, these generalized country conditions do not establish that Rivera's removal will cause his sons the exceptional and extremely unusual hardship necessary to obtain cancellation of removal. For instance, Rivera never testified that he and his family would relocate to rural Guatemala (which is the focus of the reports in the record on the availability of healthcare). Furthermore, we agree with the Agency that, "even if the financial situation of the family changes," Rivera has not met his burden of establishing that his sons would be unable to receive adequate medical care whether they remain in the United States or leave for Guatemala. See Matter of J-J-G-, 27 I. & N. Dec. at 811 (placing the burden on an applicant to prove both a serious medical condition and the inaccessibility of treatment). Nor did Rivera testify that he would not be able to get a job upon removal. Even assuming that Rivera would be unemployed or otherwise be forced to accept a reduced income, the Agency properly concluded that the reduced standard of living that comes with removal is not unusual, and Rivera has not presented enough evidence to establish the hardship his sons may face will be beyond what is to be ordinarily expected.

See In re Andazola, 23 I. & N. Dec. at 323 (comparing an applicant's situation to the hardship others might face under similar circumstances).

Considering the Agency's cumulative assessment and our review of the record, we must reject Rivera's argument that the record compels reversal. See Nolasco, 134 F.4th at 686; Wilkinson, 601 U.S. at 225 ("[Our] review is deferential.").

## III. CONCLUSION

We echo our sentiment in prior cases and "regret that we can do nothing more for petitioner and his children." Tacuri-Tacuri, 998 F.3d at 474 (quoting Alvarado v. Holder, 743 F.3d 271, 278 (1st Cir. 2014)). The law places a daunting standard before applicants for cancellation of removal, and Rivera did not meet his burden. For the foregoing reasons, the petition is **denied**.